The HURON VALLEY PUBLISHING CO., Inc., a Michigan corporation, Plaintiff,

v.

BOOTH NEWSPAPERS, INC., a Michigan corporation, Defendant.

Civ. A. No. 37457.

United States District Court, E. D. Michigan, S. D.

Jan. 7, 1972.

660

David D. Joswick, Gregory L. Curt-
ner, Miller, Canfield, Paddock & Stone,
Detroit, Mich., Donald H. Kenney, Con-
lin, Kenney, Green, O'Hagan & Henry,
Ann Arbor, Mich., for plaintiff.

Richard D. Rohr, Carson C. Grune-
wald, Bodman, Longley, Bogle, Arm-
strong & Dahling, Detroit, Mich., Ken-
neth R. Lango, Dean & Lango, Detroit,
Mich., for defendant.

## OPINION

FEIKENS, District Judge.

Plaintiff, The Huron Valley Publish-
ing Co., Inc. (hereinafter referred to as
Huron Valley Advisor) seeks a prelimi-
nary injunction to restrain defendant
Booth from publishing a weekly newspa-
per called the Washtenaw News Review.
Plaintiff contends that such a venture
would be in violation of Section 2 of the
Sherman Act, 15 U.S.C. § 2, in that it
constitutes an attempt by Booth to mo-
nopolize the advertising market.

The court issued an order to show
cause why an injunction should not is-
sue. This led to an extensive hearing in
which testimony was taken and various
documents were introduced.

The Huron Valley Advisor is a weekly newspaper published and circulated throughout Washtenaw County. It began publication seven years ago as a "shopper" or "throwaway," consisting largely of advertisements. It has never enjoyed financial success and for the past six years it has operated at a loss. This year it now appears there might be a small profit.

Recently the Huron Valley Advisor attempted to upgrade its operation. Instead of consisting solely of ads, feature stories of local interest have been included, although plaintiff makes no attempt to cover news of national, international, or even state-wide concern.

During plaintiff's early existence as a "shopper," it employed a blanket, county-wide method of circulation at one time as high as 62,000. It was distributed by mail, free to all recipients. In conjunction with its upgrading plan, the Advisor cut back on circulation to approximately 32,000 to 40,000, encouraged voluntary subscriptions and abandoned to some extent postal rural routes distribution in favor of less expensive carrier delivery.

Defendant Booth is the owner of several newspapers throughout Michigan and in Indiana. One of these papers is the Ann Arbor News, the dominant local daily newspaper for the Ann Arbor area. It is a complete paper with international, national and local news. It has a distribution of 36,997 papers daily and 35,025 papers Sunday, primarily in the Ann Arbor area, although it also circulates throughout Washtenaw County. Other daily newspapers which are distributed in that county are the Ypsilanti Press, circulation 14,992; the Detroit Free Press, circulation 15,949 daily and 22,450 Sunday; The Detroit News, circulation 4,665 daily and 12,455 Sunday; and the student newspaper of the University of Michigan, The Michigan Daily, circulation 8,550. Some of the smaller communities in the county also have small weekly newspapers.

In late October, the Ann Arbor News developed a plan to publish a weekly newspaper to be distributed free by mail in areas of Washtenaw County where the Ann Arbor News did not have significant circulation. The news and editorial content of the paper would consist of reprints from the daily paper of the preceding week. Advertising sales would be solicited primarily from advertisers in the daily paper and a separate higher rate was established for weekly-only advertisers. Retailers who ran ads in the daily could run the same ad in the weekly for $1.30 per column inch over their regular rate. A separate rate for advertising in the weekly-only was established at $1.58 per column inch.

The new publication was announced November 21, 1971. On November 26, 1971, plaintiff petitioned this court for a preliminary injunction.

This petition is denied.

■■ The rule is well settled that a preliminary injunction is an extraordinary remedy, and is granted only upon a clear showing of probable cause at trial and irreparable injury if the defendant is not restrained. Corning Glass Works v. Lady Cornella, Inc., 305 F.Supp. 1229 (E.D.Mich.1969); American Metropolitan Enterprises of New York, Inc. v. Warner Bros. Records, Inc., 389 F.2d 903 (2nd Cir. 1968). A decision to grant a preliminary injunction rests on the sound discretion of the court, and its award is not regarded as a matter of right even in the presence of irreparable injury. Yakus v. United States, 321 U. S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944). The court must balance the evidence of irreparable harm to the plaintiff if relief is denied against the evidence of harm to defendant likely to result if relief is granted and must also consider the evidence as to probability of ultimate success or failure of the suit. Hamilton Watch Co. v. Benrus Watch Co., Inc., 206 F.2d 738 (2nd Cir. 1953). The court must also consider the danger that a preliminary injunction will give a plaintiff essentially the full relief he seeks on the merits even though there has been no adjudication. Dorfmann v.

Boozer, 134 U.S.App.D.C. 272, 414 F.2d 1168 (1969).

Plaintiff contends that defendant is guilty of an "attempt to monopolize" under Section 2 of the Sherman Act. The Supreme Court in American Tobacco Co. v. United States, 328 U.S. 781, 785, 66 S.Ct. 1125, 1127, 90 L.Ed. 1575 (1946), defines this concept:

> "The phrase 'attempt to monopolize' means the employment of methods, means and practices which would, if successful, accomplish monopolization, and which, though falling short, nevertheless approach so close as to create a dangerous probability of it, . . ."

This dangerous probability exists when a defendant has sufficient market power and a specific intent to achieve monopoly.

"[W]hen that intent [to monopolize] and the consequent dangerous probability exist," Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951), a firm may be found guilty of attempt to monopolize. The requisite market definition may be somewhat more attenuated than in monopolization cases. See, e.g., Turner, Antitrust Policy and the Cellophane Case, 70 Harv.L.Rev. 281, 305 (1956), but some market power must be proven, Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 177, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965):

> "To establish monopolization or attempt to monopolize . . . it would then be necessary to appraise the exclusionary power of the [product] in terms of the relevant market for the product involved. Without a definition of that market there is no way to measure Food Machinery's ability to lessen or destroy competition."

It is thus necessary to define the relevant product and geographic market.

Plaintiff argues that the relevant market is newsprint advertising while defendant claims that all advertising must be included in the market definition. Both agree that the geographical market is Washtenaw County.[1]

For the purpose of this decision, the court cannot agree with plaintiff's contention that the relevant market must be limited to newspaper advertising alone. All advertising performs the same function of introducing and maintaining public awareness of the retailers' product. While some forms of advertising may be preferable to others because of cost, effectiveness or other factors, it is impossible to assume that an advertiser is sensitive to price changes in the newspaper advertising market alone.

If the relevant market includes all modes of retail advertising, then it is difficult to find that defendant has any significant market power. No evidence has been offered as to the percentage of the advertising dollar devoted to newsprint advertising in Washtenaw County. Nationally, the percentage is 29 percent. If this percentage is accurate as to Washtenaw County, then Booth can hardly be said to enjoy market power.

Even so, an attempt to monopolize may still be found where defendant has engaged in acts and practices so anti-competitive that an intent to monopolize may be inferred.

As to this point, plaintiff relies upon defendant's pricing policies to evidence its intent to monopolize the advertising market. The acts must be clearly anti-competitive.

> "The kind of conduct that typically establishes the requisite 'specific intent' in attempt and conspiracy cases is clearly conduct which has no social or economic justification. No benefits can be expected, at least in the long run, from predatory price cutting, coercive refusal to sell and similar

1. This does not preclude proof of a different geographical market definition at

a full trial when more facts are available to the parties and the court.

abuses of economic power. If defendants are attempting to drive someone out of the market by foul means rather than fair, there is ample warrant for not resorting to any refined analysis [as to market] . . ." Turner, Antitrust Policy and the Cellophane Case, 70 Harv.L.Rev. 281, 305 (1956).

Where there is an absence of market power, the acts complained of must be of a clear anti-competitive nature. This is not analogous to the monopoly situation where proof of power shifts the burden to defendant to prove that power was the result of "superior skill, foresight and industry." United States v. Aluminum Company of America, 148 F.2d 416, 430 (2nd Cir. 1945).

Defendant's pricing policy is not of such a clear unequivocal nature. The price established for the news weekly is $1.30 per column inch for advertisers who run identical ads in the weekly and daily papers. The price of $1.85 per column inch is the rate for weekly-only advertisers. This price is designed to cover variable costs only. No share of overhead is allocated to the weekly newspaper. Plaintiff argues that a fair share of the entire cost of the business must be allocated to the weekly paper and the cost computed on that basis. Defendant argues that the cost savings of running repeat only advertisements and feature stories may properly be passed on to advertisers. Defendant argues that the price for the weekly must reflect not only cost but the circulation of the paper. Thus the rate for the weekly actually offers an advertiser the same cost per column inch per thousand circulation as does the Ann Arbor News.

■■ The anti-competitive effect of this pricing policy is certainly not of a clear and convincing nature. It is at best highly equivocal. Defendant proposes to increase its advertising revenue. Advertisers are encouraged to spend a $1.30 per column inch more resulting in an increased expenditure of from $3.72 to $5.08 a column inch. In the absence of monopoly power, a business concern

may properly take advantage of cost savings when doing business. It is only where there is a concentration of power that such cost savings become suspect. United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948).

■ With no evidence of either market power or specific intent to attempt monopolization, plaintiff has not made a showing of probability of success on a trial of the merits, which alone is sufficient to deny the request for a preliminary injunction. In addition, the court is unconvinced that plaintiff will suffer irreparable injury.

■ Plaintiff has been, since its inception, a marginal operation. It hopes this year to make a small profit for the first time. Because plaintiff's financial position is of such a precarious nature, the potential competitive harm to plaintiff because of defendant's expansion is questionable. Even if, as plaintiff alleges, it will not be able to continue in business, the court is not persuaded that this would be due to defendant's activity.

For the above reasons, the motion for preliminary injunction is hereby denied. An appropriate order may be presented.