**UNITED STATES of America,**
**Plaintiff,**

v.

The **SCHOOL DISTRICT OF OMAHA, STATE OF NEBRASKA et al.,**
**Defendants.**

Civ. No. 73-0-320.

United States District Court,
D. Nebraska.

Oct. 26, 1973.

See also, D.C., 367 F.Supp. 198.

Brian K. Landsberg and Ross L. Connealy, Dept. of Justice, Washington, D. C., for plaintiff.

Baird, Holm, McEachen, Pedersen, Hamann & Haggart, Omaha, Neb., for defendant.

## MEMORANDUM OPINION

SCHATZ, District Judge.

This matter is before the Court on the motion of plaintiff for a preliminary injunction pursuant to Rule 65, Federal Rules of Civil Procedure. A full evidentiary hearing was held on this motion with all parties given ample opportunity to present their positions to this Court, the hearing having been completed on August 30, 1973.

The present prayer for injunctive relief stems from a complaint filed in this Court by the United States Department of Justice on August 10, 1973, alleging a cause under Title IV of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–6(a) and (b), and the Fourteenth Amendment to the Constitution of the United States. The complaint alleges that the named defendants have engaged in racial discrimination in the operation of the Omaha Public School System, located in Douglas and Sarpy Counties, Nebraska, and prays for broad equitable relief enjoining defendants from discriminating on the basis of race or color in the operation of the Omaha Public School System and requiring the school system to adopt and implement a plan to eliminate the alleged discriminatory practices so as to establish a unitary public school system in Omaha in compliance with the

Fourteenth Amendment to the Constitution of the United States. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1345 and 42 U.S.C. § 2000e–6(a) and (b).

The present motion for a preliminary injunction prays that this Court prohibit the opening of Martin Luther King Middle School (located in the Omaha School District) on September 4, 1973, as anything other than an integrated school, and further prays that the transfer policy presently in effect in the Omaha Public School System be enjoined from operating pending a full trial on the merits of this matter.

### FINDINGS OF FACT

The defendant School District of Omaha (district) has within its boundaries the City of Omaha and part of Sarpy County, Nebraska. Millard and Ralston public schools and District 66 are excluded. The school district operates 73 elementary schools, 12 junior high schools, and 8 senior high schools within its boundaries. For the 1972–73 school year, 63,125 students were enrolled in the district. Of these, 49,383 were white; 12,220 were black; and 1,521 Spanish surnamed American, American Indian and Oriental. The percentage of black students was 19.4 per cent.

As to the racial composition broken down into the various school levels, the high schools were 17.48 per cent black; the junior highs were 16.51 per cent black in 1972–73; and the elementary schools were 2.12 per cent black in 1972–73. The black population in the City of Omaha and the number of black school-age children has increased noticeably since 1950. The Negro population in 1940 was 5.4 per cent; in 1950, 6 per cent and in 1968, 8.3 per cent, of the total population in Omaha. Between 1950 and 1960 the number of school-age black children increased 110 per cent. In 1950, 52 per cent of the black people lived in three census tracts in the eastern portion of Omaha which were bounded by 24th Street to 30th Street as the east and west boundaries and Cummings Street and Bedford Street as the north-south boundaries. In 1960 these same three tracts held less than 30 per cent of the total black population and the neighboring census tracts 7, 8, 9, 12 and 13A, all were more than 50 per cent Negro, and tracts 14 and 52 had 46 to 37 per cent black population respectively. Reference to the census tracts on page 36 of defendants' Exhibit 51 shows that the movement between 1950 and 1960 was north and somewhat west of what it had been in 1950.

### SEGREGATION

As to the senior high schools, Omaha Technical High School, located in the approximate center of the school district, and towards the eastern portion thereof, enrolled a student body of 94.68 per cent black during 1972–73. North High, located north of the Technical attendance boundaries, was 31.13 per cent black in 1972–73 and Central High, immediately east of Tech High, had 30.36 per cent black in the school year. Three of the high schools (Bryan, located in the southeastern portion of the school district, Burke High, located in the west central portion of the school district, and Northwest, located in that general area of the school district) all enrolled less than 10 black students during the 1972–73 school year which amounted to less than 1 per cent of their student enrollment.

As to the junior high schools, Horace Mann Junior High, whose attendance boundaries are generally speaking within the area of Omaha Technical High School, enrolled 97.95 per cent black students in 1972–73. Monroe Junior High, located to the east of Mann and to the immediate northwest of Tech High School attendance boundaries, enrolled 40.99 per cent black students in 1972–73. Four of the junior high schools, Bancroft, Beveridge, Bryan and Marrs, enrolled ten or less black students in 1972–73, which were less than 2 per cent of their student enrollments. Bancroft and Marrs attendance boundaries are in the southern portion of the district in

relation to Mann and Monroe and somewhat east therein in certain portions. Bryan is in the southernmost portion of the district and its area is the same as that of Bryan High School. Beveridge Junior High is located in the western part of the school district and its boundaries correspond with the southern portion of Burke High School.

Of the elementary schools, eleven of the seventy-three were over 75 per cent black and 3 of those eleven were over 90 per cent black. Thirty of the elementary schools had less than one per cent and of those thirty, twelve had no black students enrolled during the 1972–73 school year. The elementary schools with the greater percentage of black students were all located in east central and northeast portion of the Omaha School District and the City of Omaha. Those elementary schools that had the least percentage of black students in 1972–73 were located primarily in the western and southern parts of the District in the City of Omaha.

## ASSIGNMENT OF BLACK FACULTY

a) Elementary schools

In the school year 1962–63, there were 55 black elementary teachers assigned to majority black elementary schools.[1] There were only 56 black elementary faculty members in the district. Clifton Hill, which along with Franklin, is an elementary school in an attendance zone which will feed into the Martin Luther King Middle School (King), turned majority black between 1966–67 and 1967–68. The first black faculty was assigned to that school in 1968–69. Franklin turned majority black in 1966–67 and its first black faculty member was assigned in 1965–66 when Franklin was 44 per cent black.

b) Junior high schools

In 1964–65 there were 21 black faculty members at the junior high level.

Nineteen were assigned to Horace Mann Junior High, which was 97 per cent black, and the other two were assigned to Tech Junior High which was 61 per cent black. In 1967–68, there were 32 black teachers in the junior high schools, 25 of which were assigned to Horace Mann (98 per cent black), 5 to Tech Junior High (89 per cent black), and 2 to Monroe Junior High (80 per cent black). In the 1971–72 school year there were 56 total black faculty members at the junior high school level, 27 of which went to Mann (98 per cent black), and 18 of which were assigned to Tech Junior High (91 per cent black).

c) High schools

The first black faculty at the high school level was assigned in 1963–64. During that year Technical High School turned majority black and 2 black faculty members out of the total of 3 were assigned to that high school. In 1963–64, the other faculty member was assigned to North High (9 per cent black). Central High (13 per cent black) had no black faculty members.

In 1972–73, 44 of the 49 black faculty members in the high school level were assigned to Tech (95 per cent black), Central (30 per cent black) and North (31 per cent black).

It would thus appear that there has been in the district an assignment of black faculty to those schools which have the greater amounts and/or majority of black students in their student bodies. (See also Government Exhibit No. 1.)

## BUILDING SITES AND FEEDER ZONES

a) Site location

The planning for the new Martin Luther King Middle School (King), which is to open in the present school year 1973–74, was started by the school board some six years ago and the final

---

1. Reference in these findings to a "majority black" school indicates one with a black enrollment of over 50 per cent. The government's reference to "predominantly black" schools during the hearing was expressed to the Court to indicate those with 65 per cent or more black enrollment. References herein also indicate that percentage.

decision to construct King was made approximately two years ago. King is located within the boundaries of the Clifton Hill elementary zone.[2]

The stated purpose of the King middle school (a relatively new idea in the district encompassing the fifth, sixth and seventh grades) was to relieve overcrowding at Clifton Hill Elementary and Franklin Elementary schools and to do away with the use of portables and cottages at those schools.[3]

Prior to the construction of King, there is evidence that some opposition to its location was communicated to the Omaha School Board. Mr. Damian D. Lacroix, a member of the Board of Education during 1969–70, testified that he had some reservations as to its construction because King was located in such a manner that the eastern boundary of the school is a railroad track and that it would be predominantly black. Mr. Lacroix submitted a resolution in February, 1970, which is marked as Exhibit 32, which *inter alia* analyzed the segregation patterns in the School District and suggested that some desegregative action be taken. In August, 1970, the district responded to this resolution (defendants' Ex. 12) and this response indicated its attitude that some revision was necessary and that such revision in the form of assignment of Negro faculty throughout the district was contemplated and would be done as soon as possible without depleting the existing staff and would be implemented with the employment of new personnel. It also points out that the number of schools with some Negro enrollment increased from 41 in 1964 to 75 in 1970 and defendants' Exhibit 4 substantiates this and extends it

to show that in 1972 there were 95 schools with some minority (not necessarily black) enrollment. Thus, there was an increase in the number of minority children that were attending school and in fact from 1962–72, the percentage of minority students attending majority white schools increased 20 per cent and the percentage of minority students who had attended schools with 80 per cent minority enrollment decreased from 66 to 46 per cent.

Opposition to the building of King at its present location was also voiced by Mr. Tim J. Rouse who has been a school board member since 1971. He pointed out that prior to his election, and afterwards, he expressed concern over King and its segregative potential. In addition, he opposed it because of its physical location and its lack of through streets and access roads. He preferred that it be built further west so that the attendance boundaries would produce a more evenly dispersed racial balance. At no time did any of the members of the Board express to him that the reason for building King at its present location was to defeat integration. The primary and stated purpose as conveyed to him was to eliminate overcrowding at Clifton Hill and Franklin.

Also opposition was voiced by an Angeline C. Wead who has lived in the Franklin school zone since December, 1963. Ms. Wead was president of the Franklin School P.T.A. in 1968 and in that capacity had some discussions relative to the proposed Martin Luther King Middle School with the Omaha Public School System. She indicated that her position, which was relayed to the School Board at a meeting in 1968, was

2. At the time the bond issue was voted on to finance the building of King, another middle school was planned which was generally referred to as the Central Park Belevedere Middle School. The bond issue was defeated in the spring of 1970 and as a result of that, Central Park was never actually built although the school district and Board of Education of Omaha Public Schools encouraged that it be built. See plaintiff's Exhibit 34.

3. "Portables" are temporary movable classroom structures that are moved to and from schools to accommodate increased student enrollment. They generally consist of one classroom per portable unit.

"Cottages" are homes in the neighborhood nearby the school proper which have been renovated and converted to classroom facilities.

that although there was considerable overcrowding at Franklin, overcrowding would be preferable to a new building because, with the residential patterns in the state of flux, by the time it (King) was built, blacks would have moved into that area and it would be 90 to 95 per cent black. She suggested the concept of an educational park with the school being moved further west with its eastern boundary on 45th Street.

Doctor Joe E. Hanna, who has been associate superintendent of the district since the fall of 1969, testified that during the spring of 1968 he was called upon to discuss the new concept of the middle school with citizen groups and at that time met with the Northwest Community Counsel and with parents of the Franklin elementary school and residents within that zone. The groups' response at that time was a strong endorsement of the middle school concept. At a subsequent meeting at which Doctor Hanna took part, in 1968, the middle school concept was again explained and Hanna testified that the members of the community present at that meeting exhibited disenchantment with the existing facilities at Franklin and they were concerned with the improvised classrooms and the ill-repair of the building. He testified that he did not recall anyone objecting to the school (King) for the reason that it would not accomplish integration.

b) Feeder zones

Clifton Hill and Franklin Elementary Schools are the two designated "feeder schools" whose elementary students reaching fifth, sixth and seventh grade levels will attend King. Clifton Hill is 89 per cent black and Franklin is 75.6 per cent black and the estimated enrollment at King is to be in excess of 65 per cent black. Clifton Hill turned majority black in 1966–67 and Franklin turned majority black in 1967–68.

Junior high school students from Clifton Hill have traditionally been assigned to Monroe Junior High School which is a majority white school with 41 per cent black students in 1972–73 and 25 per cent black students in 1971–72. It was assigned as a feeder zone to Monroe Junior High at a time when both Monroe and Clifton Hill were 100 per cent white. In 1972–73, there were a number of portable classroom units and cottages at Clifton Hill and Franklin.

Evidence was offered to show that some points in those majority white attendance zones surrounding Clifton Hill and Franklin zones are closer in distance to King than some points in Clifton Hill and Franklin. The government's position is that the School System designated Franklin and Clifton Hill, which are majority black, as feeder zones to King when it would have been more in line with the neighborhood school concept to feed students into that school who were closer to King and that failure to do so indicates a desire on its part to allow the whites in those majority white schools to stay out of black schools even though it requires further traveling distances for all concerned. Thus, it argues, a segregative intent should be inferred. The evidence supports the view that apparently some white students live closer to King than do blacks, yet those whites are allowed to go to a predominantly white school while requiring blacks who live farther from King, to attend that institution.

Plaintiff's Exhibits 18 through 25 and defendants' Exhibits 17 and 45 all deal with the distances and routes used by the people relative to this showing. Plaintiff's Exhibit 20 would seem to show that there are points in the Harrison, Rosehill and Fontenelle attendance zones that are as close or closer to King than are certain portions of the attendance boundaries in the Clifton Hill and Franklin areas. Harrison was 1.2 per cent black in 1972–73; Rosehill was 9.6 per cent black; and Fontenelle was 17.7 per cent black. Exhibit 20 also shows that certain points in Saunders, Walnut Hill, and Yates elementary attendance zones are closer to King or as close as were certain points in the Franklin and Clifton Hill areas. Saunders was 1.6

per cent black, Yates was 14.5 per cent black, and Walnut Hill was 8.7 per cent black in 1972–73. Plaintiff's Exhibit 17A indicates that some of these attendance zones are not adjacent to the Clifton Hill zone in which King is located, although all of those, including others not specifically mentioned in these findings, are in the general area surrounding King. By reference to the testimony of Ms. Aleksa, research analyst for the Department of Justice, and the direct examination of Mr. Joseph E. Chase, coordinator of Public Information Services for the district, it is seen that there is a discrepancy between the measurements taken by the government and those taken by the school district. This is also indicated by reference to defendants' Exhibits 45 and 17. However, notwithstanding the discrepancy, the Court notes that by general reference to plaintiff's Exhibit 17A, or any of the other exhibits that fairly and accurately represent the various elementary attendance zones surrounding the Clifton Hill zone in which King is located, it can be ascertained that there are some of these zones which have areas closer in distance to King than some areas in the Clifton Hill and Franklin zones. If the district had designated, for example, Harrison or Walnut Hill, rather than Franklin, as the feeder zone for King, there may have been a result of a more integrated King. However, if that had been done, students in the southwest corner of Harrison and the southwest corner of Walnut Hill would also have been a great distance from King and perhaps farther than the farthest distance between King and Clifton Hill or Franklin. Thus, a designation of one of those pre-existing zones would have also been inconsistent with the neighborhood school concept. On the other hand, a redrawing of the attendance zone boundaries before designating the feeder zones could have eliminated the distance question and would have been more consistent with the neighborhood school concept by shortening the distance to be traveled by all concerned, black or white.

In conclusion, it would appear that King will relieve overcrowding at Franklin and Clifton Hill, but it may become a predominantly black school. There is some evidence that the district was aware of opposition from the black community as to its location, and with the distance factors taken into consideration, there may well be a question presented with reference to validity of the neighborhood school concept and policy as advanced by the district.

### USE OF PORTABLES

The government contends that the use of portables and cottages in the Franklin and Clifton Hill zones, the failure to transport grades from those areas into outlying white majority zones, and the failure to adjust boundaries between the elementary attendance zones in order to gain a more balanced racial percentage, indicate segregative intent on the part of the district. As alluded to, portables were utilized by the school district at Franklin and Clifton Hill elementary schools over the preceding years. In addition, cottages were also utilized at Clifton Hill. Although portable classroom units are utilized throughout the school district, in recent years the number of portables at Franklin and Clifton Hill surpasses those placed in other schools in the district.

As far back as 1962, the Omaha Board of Education realized that a slow growth in membership was predicted in the Franklin elementary school, and recommended that the building be maintained at its capacity through boundary adjustments with neighboring schools. The adjustment of attendance boundaries is only one of many ways to deal with increased student enrollment and may not be used as frequently as other methods in the district, but the district did utilize transportation of grades, boundary adjustments, and elimination of transfers in certain schools throughout its history to accommodate increased enrollments. (See government Ex. 14). No such boundary adjustments were made at the Franklin School as recommended,

but rather, in 1964, an addition was made to that school in the form of a multiple room structure and a lunch facility. In 1962 through 1964, Franklin was not yet a majority black school and did not become such until 1967–68, turning predominantly black in the following years and remaining so in school year 1972–73. During the school years 1964 through 1971, a number of portables were added to the school, comprising a total of 13 such units, and by 1972–73, the school had some 15 portables at its location. During these years, the predominantly white elementary schools surrounding Franklin (Walnut Hill, Saunders and Yates), decreased in enrollment and at times were under capacity, although perhaps not to the extent shown by the plaintiff's exhibits due to the discrepancy in the methods of computing capacity. In either event, those schools were operating at total enrollments which, from the evidence before this Court, was by the very terms of the district's policy economically unsound inasmuch as its studies indicated that schools of less than 500 enrollment involve higher overhead costs than those which enroll from 500 to 1000 pupils. Some of the students in the Franklin school zone were as close or closer to those predominantly white schools as they were to Franklin elementary school. During the years referred to above, Walnut Hill added two portable classrooms and Saunders elementary school added a two-room annex.

In the years 1962–71, portables and cottages were also added to the Clifton Hill elementary school to relieve the ever-increasing student enrollment therein. By 1970–71, Clifton Hill had seven cottages and four portable classrooms on its site. During the above-mentioned years, the elementary schools adjacent to Clifton Hill (Walnut Hill, Rosehill, and Fontenelle), which were predominantly white, were at times under capacity, subject to the same question of degree as was present with reference to Franklin. Again, the location of Clifton Hill attendance boundaries indicates that some students living therein were as close or closer to the aforementioned predominantly white schools as they were to Clifton Hill.

The district offered evidence of maps which purported to show, by years, the "dividing" lines in both Franklin and Clifton Hill which represented a showing that in the area east of the line the population was black and to the west thereof it was predominantly white. These maps and the lines indicated thereon were developed by utilizing the 1970 census maps and analyzing the location of the black population in prior years by reference thereto, and are admittedly not totally free from possible error due to the somewhat complex method of attempting to place the line in prior years on the basis of a subsequent year's census. However, if they are reasonably accurate, the evidence would indicate that if any boundary changes had been made between Franklin or Clifton Hill during the years in question, in an attempt to take a portion of the students from those areas and put them into one or more of the surrounding predominantly white and somewhat under capacity elementary schools, the result may very well have increased segregation in the Franklin and Clifton Hill Schools. The adjustments would presumably have occurred in those areas of Franklin and Clifton Hill zones which were a greater percentage white, thus depleting the white populations therein and leaving those schools even more segregated.

Notwithstanding the possible segregative effects of boundary adjustments, the fact remains that evidence was offered to show that it was possible for the district to have transferred certain classes out of Franklin and Clifton Hill zones into the adjacent areas which would have helped relieve overcrowding in those schools, and may have eliminated the addition of the number of portables and cottages that were otherwise required therein to accommodate the rising enrollments. It appears that this could have been done without doing damage to the neighborhood school con-

cept because certain portions of the school areas in Franklin and Clifton Hill are relatively close to the elementary schools surrounding them which were mentioned above, and transferring entire grades had been done on prior occasions. The cost factor in transporting students in order to transfer an entire grade is certainly a major consideration, but there is likewise considerable expense involved in providing portables and renovating cottages.

## OPTIONAL ZONES

The general practice in the district is that children in elementary school zones go to certain junior high schools within the general geographical locations of those elementary schools when they attain junior high age. However, the school system does operate several optional areas. If a student lives in a non-optional elementary zone, he may be directed to go to a certain junior high school. If he lives in an optional elementary zone, he is given an option to attend a number of different junior high schools.[4]

Technical Junior High School, located in a portion of the Technical Senior High building, was closed after the school year, 1971-72. At that time it had an enrollment of 551 black students and 48 white students. Tech Junior High, majority black since 1962-63, became predominantly black in 1966-67. In 1971-72, certain elementary zones had options to attend Tech Junior High: Walnut Hill (5.2 per cent black) located to the west and somewhat north of Tech, had an option to go to either Tech, Lewis and Clark (which is located to the west and south of Walnut Hill elementary zone) and Norris Junior High (which is located directly south of Walnut Hill). Tech Junior High was 90 per cent black,

Norris was .7 per cent black and Lewis and Clark was 1.7 per cent black. Saunders (2.8 per cent black) located just south of Walnut Hill elementary zone, had an option to go to these same junior high schools. Conestoga (93.7 per cent black), had an option to attend Tech Junior High or Horace Mann Junior High—the latter being 97.8 per cent black at that time, and located north of the Technical High School; Mason (2.1 per cent black) located to the south of Tech and in the southeastern portion of the Omaha school district, had an option to attend Tech or Bancroft Junior High (.4 per cent black) and some had the option of attending Norris Junior High. The elementary zones that feed directly into Tech Junior High with no option during the 1971-72 school year were Central grade, which was over 20 per cent black; Franklin, which was over 85 per cent black; Kellom which was over 90 per cent black; and Yates, which was 12 per cent black. As pointed out above, Walnut Hill, Saunders, Conestoga and Mason had options to attend Tech Junior High, along with other junior high schools. Saunders, Walnut Hill and Mason were predominantly white, as were Central grade and Yates.

Even with this number of predominantly white elementary schools feeding into Tech Junior High in the years 1971-72, the student enrollment at that junior high during the year 1971-72 was 90.9 per cent black and only 48 white students were in attendance that year. Walnut Hill and Saunders are within a mile of Tech Junior High, yet in 1971-72, only 1 white student from each of those schools attended Tech Junior High. This would indicate that the students in those predominantly white optional schools exercised their options to attend other junior high

4. Another example of the use of an optional policy occurred when Tech Junior High was closed after 1971-72. At that time the majority black schools were given an option of having the seventh grade of their elementary school continue for a one-year period. Plaintiff argues that this shows an attempt to "wed" the blacks to their black community. However, this option was also given to the parents at the other feeder schools for Tech Junior High if they could get enough pupils and, therefore, this option neutralizes the option given to the majority black schools as to the segregative intent to be inferred therefrom.

schools and the ones without options utilized the schools' transfer policy which will be discussed, *infra,* to transfer out of Tech Junior High and into another school. It would appear from looking at the map that elementary students in the Mason zone would likely have had to travel farther to North or Bancroft than they would have had they gone to Tech Junior High. The same is true as to Walnut Hill, as it is generally with Saunders.

During the 1971–72 school year approximately 600 students were enrolled at Tech Junior High School. There was evidence offered which would show that the capacity for Tech Junior High, at least in 1964–65, was 795 pupils. This determination was based on a 30 pupil per classroom computation. However, the evidence shows that this number is not necessarily the best for educational purposes and is not an accurate number to determine the school's capacity because inner-city schools, as Tech Junior High, have lower teacher-student ratios as a policy of the school. Junior high classes are smaller, generally speaking, than elementary classes and special education classes, which Tech Junior High had, are necessarily smaller. Thus, there is evidence that the capacity of the schools based on the 30 pupils per classroom was not necessarily a proper guideline and that some of the capacities listed in the various studies are not accurate. It would appear that capacity at Tech Junior High was not as large as indicated in the government's Exhibit 8A. However, whether or not its enrollment was under capacity at this time, the optional zones in effect in 1971–72 were instrumental in allowing Tech Junior High, which was located in a predominantly white neighborhood as of 1970, to become predominantly black.

From the testimony and various exhibits, it would seem that the most apparent reason for assigning certain elementary zones as optional zones to the surrounding junior high schools is that those schools generally are adjacent to the optional zones. For example, surrounding Walnut Hill is Lewis and Clark on the west, Norris on the south and Tech on the east. Surrounding Saunders is Lewis and Clark on the west; Norris on the south; and Tech on the east. Since the distance factor was material and important in designating various optional schools, this has some bearing and makes the optional zones more reasonable in this case.

Also the government points out that white students are not always allowed to transfer out of black areas. In 1957–58, Franklin elementary seventh and eighth graders were assigned to Tech which was then predominantly white. It further points out that one of the explanations for fewer students going to Tech Junior High from Mason in 1971–72 could very well be the fact that between Tech Junior High and Mason is a stretch of primarily business and commercial-industrial and also the Dodge Street interchange was going through in 1965–66 at the time that Mason was converted to a K through 6 institution, and its seventh and eighth graders were assigned to different areas.

All the evidence taken together would seem to show that the use of these optional zones may have had some segregative effect, but the question remains whether segregative intent is a valid inference.

## GRADE STRUCTURES

This particular area is somewhat related to that of the optional zones. The district started developing plans for a junior high system in the 1950's with Monroe Junior High. This was followed by Norris, Indian Hills, Horace Mann, McMillan and Lewis and Clark. Technical Junior High was designated as such in the early 1960's. The district's policy is that of phasing out all K–8 facilities.[5] During the school year 1964–65, there were certain elementary schools that still had K–8 and, therefore, were not

5. Kindergarten through eighth grade.

assigned to any junior high schools. They are as follows: Jackson (.3 per cent black); Mason (3.7 per cent black); Pershing (0 per cent black); Sherman (.5 per cent black); Walnut Hill (2.5 per cent black); and Yates (.3 per cent black). By consulting the exhibits concerning elementary school attendance areas, one can see that all of these schools were in the general vicinity of Tech Junior High and the Franklin, Clifton Hill areas.

Of the schools above mentioned that were still K–8 in 1964–65, Walnut Hill converted in 1967–68 and it started that school year with 98.2 per cent white. The students eligible for junior high in Walnut Hill were given options to attend Lewis and Clark, Norris or Tech as pointed out above. Saunders converted in 1964–65 when it was 100 per cent white and was given similar options to attend Lewis and Clark, Norris or Tech Junior High. Mason was converted in 1965–66 at which time it was 97.3 per cent white and had options to attend Bancroft, Norris or Lewis and Clark. Plans were made to convert Yates for the school year 1969–70 (when it was predominantly white) but due to opposition from various parents, it was continued as K–8 for another year. This plan to convert Yates was apparently just a proposal when the various parents spoke against it, and the following year, 1970–71, the seventh and eighth grades were closed, even though there was some continued protest that it not be closed. Jackson, Pershing and Sherman are elementary zones that still have seventh and eighth grades and, hence, no options. Central Park, Monmouth Park and Miller Park all converted in 1958–59 at which time they were 100 per cent white and they were not given options but were assigned specifically to McMillan Junior High which was then 100 per cent white and continues to be a predominantly white school.

The government's position is that since there were a number of predominantly white schools in an area around Tech Junior High and Horace Mann Junior High (both majority black) that were still K–8 schools as late as 1964–65, there is an indication that the district was allowing the students in those predominantly white elementary zones to stay there two years longer rather than directing them to exercise an option to attend Tech Junior High or some other school zone that was predominantly black. Its position is also based on the fact that the elementary zones that converted most recently were those surrounding the black areas in Omaha and thus it infers that this was a final holdout in an attempt to allow elementary school zones to keep themselves and their predominantly white enrollment together and not force children to attend junior high schools which would probably be in an area with a greater black percentage than were their elementary zones.

The district contends that the conversion from K–8 to K–6 is historically a gradual process. It maintains that the conversions to K–6 facilities in the district have not been managed in such a way as to increase or encourage segregation and attempts to show a logical basis for such late conversions by evidence to the effect that the schools in question were ones which were to have been assigned to a number of junior highs in the City that were eventually not constructed and thus were converted only when the decision not to construct those schools was finally made. These junior high schools were: (a) a central city junior high school which was to be located essentially south of the business district in Omaha; (b) one on Western Avenue, located some twelve blocks north of Dodge Street, the main east-west street in the City of Omaha, running from 50th Street to 78th Street, from 83rd Street to 90th Street, and from 90th to 96th Street (this latter junior high school later merged into Lewis and Clark); (c) a junior high in Miller Park, the site for which the district failed to acquire and which ultimately merged into what is now McMillan Junior High located in the north-

ern part of the district and on the eastern boundaries thereof (the building of McMillan at this place isolated the Sherman elementary zone which is located just directly east and adjacent to the McMillan zone and the Pershing zone which is located to the southeast of Sherman and directly south of the Omaha Eppley Airfield; this would seem to explain the reason why these two schools have not yet been converted from K–8 to K–6); (d) a junior high along Paxton Boulevard, which runs between 31st and 32nd Streets in the northern part of Omaha, which was not built because of changing conditions and circumstances.

## TRANSFER POLICIES

In addition to the fact that Tech High School and Central High School are "open" schools,[6] and in conjunction with the optional zone policy which was discussed, *supra*, the district also has another method by which students can attend areas other than those in which they live and those which may be closer to their homes. This method is commonly referred to as the "open transfer" policy, which was introduced into the system in 1964 during the administration of Doctor Paul A. Miller, who was then Superintendent of Schools. It resulted from the study and recommendation of a bi-racial committee which was appointed by the Mayor of Omaha in the spring of 1963. The following conditions govern the ability to transfer from the zone of residence to another school:

1) The achievement level of the pupil requesting transfer shall equal the average level of achievement of the pupils in the grade in the school to which the transfer is being requested.

2) The school to which the pupil is transferring cannot be an overcrowded school.

3) Transportation of pupils is the responsibility of the parents.

4) The transfer request must be in writing on an individual basis.

5) Permission to transfer shall not be granted until enrollments are ascertained.

Prior to the adoption of this policy, transfers were allowed only for reasons of health or hardship. Students could not transfer for the reason that the student did not want to attend a school with black pupils, or because he felt that he was going to an inferior school or because the educational progress in another school was superior in his opinion. The primary and stated purpose of the open transfer policy of 1964 was to encourage and upgrade the academics of the school system. The program was viewed as having no connection with segregation or integration.

To utilize this policy, parents make written request for transfer which request is placed on file with the particular school which is desired. The district then communicates with the principal of the school in question to determine the space and specific problems involved and also communicates with the parents to suggest alternative methods if space is not available or if for some reason transfer cannot be granted. Aside from the five determining factors set forth above, other considerations include special education or medical problems. In addition, the administration of the school also looks to problem situations or learning situations and may grant a transfer in a situation where a student may stand a better chance to succeed in the transferee school. Financial hardship cases are also considered.

The transfer request forms do not include a space for designation of the race of the applicant. However, the district does maintain records which happen to show the race of some students and at times there are interviews by the administration with the parents of the student

---

6. This means generally that students of high school age who do not live in those zones have a choice of going to those high schools if they choose to do so. The students who live in the Tech or Central zones, however, must attend the high school in their respective zone.

requesting the transfer. Approximately one-third of the transfer requests are dealt with on an interview basis. Additionally, the transfer request forms have a space for the requesting party to indicate any reasons as to why the request is made. There was testimony that these reasons are not necessarily taken into account in the granting or denying of transfer requests, but they are often utilized in hardship cases. This is a matter of practice, not of any standard policy.

Once a student obtains a transfer to a particular school, he must re-apply for a transfer if he desires to attend that particular school, or another outside his attendance zone for the next year. If he wishes to choose another school available to him under an option (other than the one initially chosen) he must likewise obtain a special transfer. The same procedure is applicable in the case of high school level transfers.

At the time this transfer policy was introduced there was some evidence of opposition from members of the minority race that this program would work against the poor and the black students because of the requirement of equal achievement and the parents having to transport their children. Additionally it was argued that the requirement that the size of the class in the receiving school be no larger than the size of the class of the transferor school would have an adverse effect due to the fact that the inner-city school classes generally were smaller than others pursuant to school policy.

However, Dr. Miller testified that he knew of no instance where a transfer was denied on the basis of achievement levels during his tenure except for situations where an individual who needed a special education class attempted to transfer from a school that employed such classes into a school which did not. He further testified that the ultimate purpose of the policy was to encourage transfers into better schools for all children concerned.

As to the actual results of this transfer policy, the government introduced Exhibits 26, 26A, B, and C, which purport to represent certain transfer requests by black and white students out of majority black schools into predominantly white schools during the school year 1970–71. (There was considerable controversy over the foundational soundness of these exhibits.) Plaintiff's Exhibit 26 indicates that there were white transfers allowed out of black schools into predominantly white schools specifically for racial reasons, as well as others. However, the exhibit does not include transfers by white students from a majority white school to another majority white school which is less white than the school to which he had been originally assigned. Also there were no computations as to the number of white students transferring from majority white schools into majority black schools. The testimony of a government attorney who participated in examining the school records and photographing them, one William C. Graves, indicated that the rule of thumb followed in preparing the exhibit was to separate out any requests that may have had a potential racial effect, either segregative or desegregative. At the time the government witnesses were looking through this file, they had no idea as to the race of the children involved and they later attempted to correlate the race with the students. Graves explained that they photographed transfers from majority black into majority white schools and from majority white into majority black schools and additionally noted any transfer requests that were approved which appeared to consider a racial reason, no matter what the schools were. He testified that they also considered those requests which were denied and which had listed a racial reason. The district's evidence on this question indicated that certain portions of Exhibit 26 were substantially less than accurate, specifically those sections dealing with the transfers of black students from majority black schools to majority white schools.

The district pointed out that there were a number of transfers from black schools to Benson West school. The transferor schools in this case were Holy Name, which is located in Franklin and Clifton Hill attendance zones, and Kennedy elementary school, which is a majority black school, as well as others. (See defendants' Exhibits 21 through 38.) The government's research analyst, Cindy Aleksa, testified from her notes that apparently no photographs were taken of any transfer requests to Benson West. There were 24 to 25 students involved in these transfers from black schools to majority white Benson West, and therefore, Exhibit 26, page 10, which indicates the total black transfers out of elementary schools to predominantly white schools in 1970–71 is claimed to be inaccurate by 50 per cent. The district also pointed out that some of the dates in Exhibit 26 were misleading and failed to include situations where the school district denied transfers for racial reasons, as where a white mother in Clifton Hill sought a transfer for her child to Fontenelle Park and gave as a reason the fact that more white girls would be in Fontenelle Park for her to associate with. This request was denied.

Thus, there were certain discrepancies pointed out in Exhibit 26 regarding the number of black students who were allowed to transfer to predominantly white schools and regarding the nature of the transfers which were allowed from black schools to majority white schools. Although the evidence shows that black students were granted transfers on nearly as equal a percentage as were white students, and that black students did transfer to white schools, it also appears that some black students were denied access to a majority white school (Lewis and Clark) for the school year 1970–71 for the reason that it was overcrowded, whereas at the same time some white students were allowed to transfer from majority black schools into that school.

It would appear that Exhibit 26 has some probative value for the government's contentions as to the transfer issue but that the exhibit is incomplete and inconclusive. This issue should be better investigated and thoroughly presented at trial where the exhibit can be comprehensive and the evidence in connection therewith fully developed by both parties.

## INTEGRATION

Some integration of school children has occurred in the school district over the past years. In some of the predominantly black schools in the district, the membership of black students declined from 1967–68 to 1972–73 (defendants' Exhibit 48). Furthermore, the evidence shows that although there has been an increase in the number of schools with a predominantly minority enrollment (80 per cent or more), the total percentage of the total minority attending those schools has dropped 20 per cent since 1962. Additionally, schools with some minority enrollment have increased noticeably in the last ten years and, in 1972, 45 per cent of the total minority students attended majority white schools (defendants' Exhibit 4). Although this reference to "minority" includes Orientals, Indians, and Spanish surnamed Americans, as well as black students, it does show a trend of some integration occurring in the district since 1962.

## CONCLUSIONS OF LAW

The relief requested by the plaintiff, to wit: a preliminary injunction, is traditionally viewed as relief of an extraordinary nature and does not purport to be a disposition of the matter on its merits. An injunction, since it is viewed as an extraordinary remedy, is not routinely granted. Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 S. Ct. 834 (1944); Sierra Club v. Hickel, 433 F.2d 24, 33 (8th Cir. 1970), aff'd, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319, 323 (2d Cir.), cert. denied, 394 U.S. 999, 89 S.Ct.

1595, 22 L.Ed.2d 777 (1969); Huron Valley Publishing Co. v. Booth Newspapers, Inc., 336 F.Supp. 659, 661 (E.D. Mich.1972). As stated in Benson Hotel Corp. v. Woods, 168 F.2d 694, 696 (8th Cir. 1948):

> "The application for such an injunction does not involve a final determination on the merits; in fact, the purpose of an injunction pendente lite is not to determine any controverted right, but to prevent a threatened wrong or any further perpetration of injury, or the doing of any act pending the final determination of the action whereby rights may be threatened or endangered, and to maintain things in the condition which they are in at the time . . . until the issues can be determined after a full hearing."

*See also* Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 742 (2d Cir. 1953); Perry v. Perry, 88 U.S.App.D.C. 337, 190 F.2d 601, 602 (1951).

■ This Court soundly supports the foregoing view of the nature of such preliminary relief. Due to the time factor involved in the present situation, and in the majority of the situations where this type of remedy is pursued, it is not the province nor the design of this Court to provide a finding on the ultimate issues of law and fact at this time. Such a finding should be made only after all parties have had ample opportunity to employ the liberal discovery processes offered by the Federal Rules and to otherwise prepare the matter in detail for presentation to this Court in a manner conducive to sound and deliberate legal determination. With the foregoing in mind, the Court will proceed to analyze the present issues within these legal concepts.

■ The granting or denying of injunctive relief at the preliminary stage of any matter requires the consideration of a number of varying factors. The two that present the starting point in any such determination are (1) the question of ultimate success on the merits; and (2) irreparable harm to be suffered by those seeking such relief in the absence of the same being granted. The Eighth Circuit Court of Appeals has recently held that when viewing the first of these factors, the Court must determine whether the movant, herein the Justice Department, has sustained its burden of showing *"substantial* probability of success at trial."* Minnesota Bearing Co. v. White Motor Corp., 470 F.2d 1323, 1326 (8th Cir. 1973). In assessing the relative merits of a prayer for injunctive relief, the following formulation of factors to be considered within the two foregoing major considerations is instructive:

> "(1) The significance of the threat of irreparable harm to plaintiff if the injunction is not granted;
>
> "(2) The state of the balance between this harm and the injury that granting the injunction would inflict on defendant;
>
> "(3) The probability that plaintiff will succeed on the merits; and
>
> "(4) The public interest."

11 C. Wright and A. Miller, *Federal Practice and Procedure,* Section 2948 at 430–431 (1973).

*See e. g.,* Kansas-Nebraska Natural Gas Company v. City of St. Edward, 135 F. Supp. 629 (D.Neb.1955) (Delehant, J.). *Cf.* Middlewest Motor Freight Bureau v. United States, 433 F.2d 212, 241 (8th Cir. 1970), cert. denied, 402 U.S. 999, 91 S.Ct. 2169, 29 L.Ed.2d 165 (1971).

## PROBABILITY OF SUCCESS

The Court has carefully studied the cases cited by both the district and the government in their respective briefs, as well as other cases, in the area of school segregation. Certain general and well-known principles seem to be clear.

■ *De jure,* or deliberate, racial segregation in public schools is violative of the equal protection clause of the Fourteenth Amendment of the United States Constitution. Brown v. Board of Education, 374 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). In order to support a

finding of *de jure* segregation, it is not necessary that there be complete separation of the races. The actions of a school board may be sufficient to constitute *de jure* segregation without being based on a state law, or even if they are in derogation of state law forbidding segregation. United States v. Board of School Commissioners of Indianapolis, Indiana, 332 F.Supp. 655 (S.D.Ind. 1971), aff'd, 474 F.2d 81, 83 (7th Cir. 1973), cert. denied 413 U.S. 920, 93 S. Ct. 3066, 37 L.Ed.2d 1041 (1973).

A neighborhood school plan is not unconstitutional per se and is permissible if impartially maintained and administered, even though the result is racial imbalance. United States v. Board of Education, Independent School District No. 1, Tulsa County, Oklahoma, 429 F.2d 1253 (10th Cir. 1970), aff'd after remand, 459 F.2d 720 (10th Cir. 1972), vacated and remanded on other grounds, 413 U.S. 916, 93 S.Ct. 3048, 37 L.Ed.2d 1038 (1973). A school district has no affirmative obligation to achieve a balance of the races in the schools when the existing imbalance is not caused by school policies and is the result of housing patterns and other forces over which the school administration has no control, but it does not follow from the absence of a duty to achieve racial balance that a Board may deliberately select sites to achieve racial segregation. Davis v. School District of the City of Pontiac, 309 F.Supp. 734 (E.D.Mich. 1970), aff'd and remanded, 443 F.2d 573 (6th Cir.), cert. denied, 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971), vacated and remanded in part, 474 F.2d 46 (6th Cir. 1973); Deal v. Cincinnati Board of Education, 369 F.2d 55 (6th Cir. 1966), cert. denied, 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967), aff'd after remand, 419 F.2d 1387 (6th Cir. 1969), cert. denied, 402 U.S. 962, 91 S. Ct. 1630, 29 L.Ed.2d 128 (1971). If residential racial discrimination exists, it is immaterial that it results from private action. In some cases the school boards still cannot build its exclusionary attendance areas upon private racial discrimi-

nation. United States v. Board of Education, Independent School District No. 1, Tulsa County, Oklahoma, *supra*. If a neighborhood school policy is formulated with no intent or purpose to maintain segregation or to segregate, then no constitutional duty exists to desegregate even if racial imbalance exists. There is no affirmative duty to change school attendance districts by the mere fact that shifts in population either increase or decrease the percentage of either black or white pupils. Bell v. School District, City of Gary, Indiana, 324 F.2d 209 (7th Cir. 1963), cert. denied, 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216 (1964); Downs v. Board of Education, 336 F.2d 988 (10th Cir. 1964), cert. denied, 380 U.S. 914, 85 S.Ct. 898, 13 L.Ed.2d 800 (1965).

A school board may not purposefully tailor the components of a neighborhood school attendance policy so as to conform to the racial compositions of the neighborhoods and its school district, nor may it build upon private residential discrimination. Spangler v. Pasadena City Board of Education, 311 F.Supp. 501 (C.D.Cal.1970); United States v. School District 151 of Cook County, Illinois, 286 F.Supp. 786 (N.D. Ill.), aff'd, 404 F.2d 1125 (7th Cir. 1968).

Acts of omission can be as serious as acts of commission where a Board of Education has contributed to and played a major role in the development and growth of a segregated situation and could support a finding that the Board is guilty of *de jure* segregation. Davis v. School District of Pontiac, *supra*, 309 F.Supp. 734.

The decision of where or where not to construct new schools when combined with one technique or another of student assignment may very well determine the racial composition of the student body in each school in the system. People tend to gravitate towards school facilities just as schools are located in response to the needs of the people. Swan v. Charlotte-Mecklenberg

Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). In this connection, open transfer policies are not in themselves unconstitutional. However, where the intended and inevitable effect of such a policy is to aggravate and increase racial segregation, action should be taken to eliminate those segregative effects. Monroe v. Board of Commissioners, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968).

■ The practice of a school district in its assignment of faculty members on the basis of race, in such a manner that those faculty member assignments allow the school to be recognized and considered a "black" or "white" school, is not consistent with the protection of the Fourteenth Amendment. Swan v. Charlotte-Mecklenburg Board of Education, *supra*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554; Kelley v. Altheimer, Arkansas Public School District, 378 F.2d 483, 498–499 (8th Cir. 1967).

■ The recent pronouncement by the Supreme Court in Keyes v. School District No. 1, Denver, Colo., 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973), requires that the government must prove not only that segregated schooling exists, but also that it was brought about or maintained by intentional action. The following quote from a recent case of Booker v. Special School District No. 1, Minneapolis Minn., 351 F.Supp. 799, 807–808 (D.Minn.1972), sets forth what this Court believes to be the general rule and the outline of proof necessary to demonstrate a violation of the Fourteenth Amendment:

"However, it is beyond dispute that:

(a) if the State and/or the school administration has taken any action with a purpose to segregate, and

(b) if that action has had the effect of creating or aggravating segregation in the schools of the District, and

(c) if segregation currently exists, and

(d) if there is a causal connection between the acts of the school ad-

ministration and the current condition of segregation,

then there is segregation which is imposed by law; and such is prohibited by the Fourteenth Amendment to the Constitution."

This constitutes *de jure* segregation and is violative of the Fourteenth Amendment.

■ The evidence presented by the government has been primarily designed to show specific acts of the school district, to wit: transfer policy, attendance zones, teacher assignment, school site location and portable classrooms, in an attempt to demonstrate that these particular acts have a bearing on the intent of the school district when the results of those actions are determined. To be sure, the cases cited by the government and those found by the Court's independent research indicate that these factors in the proper context are indicia of segregative intent. However, the Court also notes that there is evidence presented of reasonable school-related reasons for introducing and implementing such plans and in the absence of findings at this stage of segregative intent, no affirmative duty attaches to the school district. The finding of segregative intent necessarily requires the Court to infer such intent from certain objective acts. This is not easily done and cannot be done or justified in the state of the present record. The fact finding process that this Court must undertake in determining subjective intent from objective manifestations requires a full hearing on the merits. Therefore, although the Court at this stage might see a possibility of the government's prevailing on the merits when the matter is fully tried, it does not find at this stage of the proceedings that there appears to be a *substantial* probability of ultimate success at trial.

### IRREPARABLE HARM

■ As pointed out above, the injury or harm that will occur to the movant-plaintiff is of the utmost impor-

tance in the consideration of the relief now requested. However, the harm to be suffered by the opposing party is also properly considered. *See e. g.*, Penn Galvanizing Co. v. Lukens Steel Co., 468 F.2d 1021, 1023 (3rd Cir. 1972); Sierra Club v. Hickel, *supra,* 433 F.2d at 33; Congress of Racial Equality v. Douglas, 318 F.2d 95, 97 (5th Cir.), cert. denied, 375 U.S. 829, 84 S.Ct. 73, 11 L.Ed.2d 61 (1963). The Court has attempted to determine and weigh the harm that will be suffered by all concerned if this injunction is granted or denied. The government rests its main contention of irreparable harm on the fact that a Constitutional right will be denied the children who are forced to remain in segregated schools if the injunctive relief is not granted. It also contends that children will be forced to leave an integrated school, Monroe, and go to a segregated school, King. In addition, it maintains that irreparable harm will be suffered if King is allowed to be opened and stigmatized as a "black" school. On the other hand, the district maintains that at this late date, an injunction closing Martin Luther King or requiring it to be immediately integrated, would require changes in student assignments, teacher assignments, and would require that many pupils return to Franklin and Clifton Hill, both of which were severely overcrowded before the construction of King. As to the transfer policy, the government maintains that all that would be required is that the students be returned to the school which they attended last year. In rebuttal, the district maintains that changing the schools which students will attend at this late date will create serious problems with parents who have provided for babysitters for their children in a certain area of their work; interrupt curricula in the schools; interrupt extracurricular activities; and generally result in a state of confusion if relief must be administered before this coming Tuesday, September 4, 1973.

The Court is not unmindful of the fact that its determination of irreparable injury to the respective parties must depend somewhat on its determination of the likelihood of success on the merits. As pointed out above, the government certainly indicates some possibility of succeeding on the merits, but it has failed to prove a *substantial* likelihood of success at this point. The Court finds that the harm to the district and all the children of the Omaha School District at this point, including the class which the plaintiff represents, would be greater than the harm in continuing "possible" unconstitutional segregation. The Court reaches this conclusion after careful deliberation and is aware of the possible injury or harm that may be incurred by the students if a violation of the Fourteenth Amendment is found to exist after a full hearing on the merits. On the other hand, at the present time, a granting of this injunction would require many students to return to portables and cottages used at Clifton Hill and Franklin where overcrowded conditions have clearly existed which King is at least in part designed to alleviate. Further, the confusion resulting by revoking all the transfers given this summer would be mammoth, as would the confusion with reference to the re-planning and re-programming of curricula, extra-curricular activities and teacher assignments.

In addition to balancing the relative harms that would be suffered by the defendants or plaintiff and the class it represents in this suit, the Court when analyzing the granting or denying of a preliminary injunction, may also legitimately consider the public interest. Yakus v. United States, *supra,* 321 U.S. at 414, 64 S.Ct. 660. The Court finds that the public interest in opening schools on September 4, 1973, in a relatively unconfused and stable manner, is important to the children and may very well alleviate and cause fewer problems than would any purported segregated situation.

In conclusion, this Court finds that the motion for a preliminary injunction should be denied. In doing so, it in no

way indicates that the government does not have a possibility of success at the trial herein. The denial stems from the evidence so far presented and in the record to date there has been no showing of substantial probability of success. In order to ascertain the intent of the district over the years in question, a full hearing on the merits is clearly required, so that this Court can carefully examine and weigh the facts within the context of their occurrence. As stated in Webb v. Board of Education of the City of Chicago, 223 F.Supp. 466 (N.D. Ill.1963), which involved strikingly similar issues to the questions presented here:

> "It is not necessary for the Court to determine at this time the respective merits of these contentions. We need only note that substantial questions of fact are raised as to whether the segregation complained of is the result of an active and intentional design of the Defendants."

Accordingly, plaintiff's motion for a preliminary injunction is denied, the order of denial being separately entered herein.