**PENN GALVANIZING COMPANY,**
Appellant,

v.

**LUKENS STEEL COMPANY.**
No. 71–1777.

United States Court of Appeals,
Third Circuit.

Argued Sept. 8, 1972.

Decided Oct. 24, 1972.

H. Laddie Montague, Jr., Philadelphia, Pa. (David Berger, David Berger, P. A.,

Philadelphia, Pa., on the brief), for appellant.

Edward W. Mullinix, Philadelphia, Pa. (Michael J. Mangan, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., James F. Mulligan, Gen. Counsel, Coatesville, Pa., on the brief), for appellee.

Before VAN DUSEN, ALDISERT and HUNTER, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

This is an appeal from the June 25, 1971, order by the district court denying Penn Galvanizing's motion for a preliminary injunction.

Penn Galvanizing Company, plaintiff, specializes in the inspection of steel plate by ultrasonic devices. Defendant, Lukens Steel Company, is one of the two major producers of HY–80 steel plates, which are used in the production of submarine hulls. Lukens also performs ultrasonic testing. The Electric Boat Division of General Dynamics Corporation (Electric Boat) builds submarines for the United States Navy, and being without its own testing facilities, Electric Boat contracts out the testing of steel plate. Electric Boat has in the past purchased steel plate from Lukens and has contracted out testing to Penn Galvanizing.

There are two methods of ultrasonic testing, the scanning method and the static method, and the major question in this case is whether the static method meets the Navy's specifications. Under both methods, a 24-inch grid system is superimposed on the steel plate to be inspected. In the static method, the plate is tested only at the intersection points on the grid; in scanning, the vertical and horizontal lines of each block in the grid are tested, as is also one diagonal line within each block. The scanning test thus covers a considerably larger portion of the surface area of the steel plate and consequently reveals imperfections which would pass unnoticed with the static method. Both methods use identical equipment.

The Navy specifications are set out in the margin.[1] Up until April 1966, Electric Boat had, on its own, required that steel plate be tested by scanning. Electric Boat apparently dropped this requirement in response to an announcement by Lukens that, because of the higher rejection rate of steel plate tested by scanning, Lukens would charge more for plate to be tested by scanning than for plate to be tested by the static method. In 1969, when Electric Boat reinstituted this requirement, Lukens reiterated its pricing policy; apparently Electric Boat again dropped the requirement. In any event, Electric Boat has not contracted out to Penn Galvanizing any testing of plate for the Navy since sometime in 1970.

Penn Galvanizing's initial complaint contained four counts, two of which are relevant here: (1) that Lukens' quoting a higher price for steel to be scanned was

---

1. MIL-S-16211.6G (SHIPS) provides in part:

"10.3 *Background.*—Plate for submarine and other specialized Naval application requires control of quality beyond that commonly required for other structural application. These tests are intended to assure freedom from lamination, excessive segregation, and uniformity of heat treatment throughout the plate area.

.    .    .    .    .

"50.1.2 The plate shall be gaged at the corners of a 24 inch grid pattern using an ultrasonic gaging device.    .    .    .    .

.    .    .    .    .

"50.2.1 Plate    .    .    .    shall be proven free of laminations by ultrasonic inspection.    .    .    .

.        .        .        .        .

"50.3.5.1 *Static method.*—This constitutes the minimum logitudinal wave examination permitted on a plate. Testing shall be performed by interpreting the cathode ray tube presentation when the search unit has been statically placed at each intersecting grid line on one major surface of the plate. The grid pattern correspond to that speciifed in 50.1.2. If an unacceptable condition is indicated, the adjacent area shall be scanned by the continuous method to determine the extent and magnitude of the defective condition,"

a tie-in in violation of the Sherman Act, 15 U.S.C. § 1 (1970); and (2) that Lukens injured the United States and, derivatively, Penn Galvanizing as a taxpayer, by supplying steel plate with defects which would not be revealed by static testing.[2] The complaint requested monetary and injunctive relief. Penn Galvanizing subsequently filed a motion for a preliminary injunction, incorporating the above claims and additionally asserting that a substantial conflict of interest existed when Lukens tested plate which Lukens itself had produced. Penn Galvanizing requested that Lukens be enjoined from selling "defective" plate to the United States, from holding itself out as qualified to perform ultrasonic testing, and from being paid for testing done on plates it produced.

After a hearing, the district court determined that the Navy specifications required only static testing of plate and that Lukens' higher price resulted from the higher rejection rate of steel tested by scanning. It also found that any harm Penn Galvanizing suffered could be remedied by money damages and was, therefore, not irreparable. Consequently, that court denied the motion for a preliminary injunction.

■ The criteria for obtaining a preliminary injunction and the standard of review of the trial court's decision are well settled. A party seeking a preliminary injunction must demonstrate, inter alia, a reasonable probability of eventual success on the merits and irreparable injury *pendente lite*. A. L. K. Corp. v. Columbia Pictures Industries, Inc., 440 F.2d 761, 763 (3d Cir. 1971). The district court has broad discretion, since its task involves weighing the benefits and burdens that granting or denying the injunction will have on each of the parties and on the public. Commonwealth of Pennsylvania v. O'Neill, No. 72–1614 (3d Cir. Sept. 14, 1972).

■ The district court's reading of the Navy's specifications is by no means strained. It is clearly supported by the evidence taken at the hearing. This evidence included the testimony of Rear Admiral Mason, the Commander of the Naval Ship Engineering Center, that the Navy's interpretation of its own specifications was that they in effect required absence of defects only at the grid points tested by the static method. Penn Galvanizing's reliance on Crown Coat Front Co. v. United States, 292 F. 2d 290, 154 Ct.Cl. 613 (1961), is misplaced. *Crown Coat* involved a controversy between the United States and a government supplier as to the meaning of a contract; the case is not a precedent supporting the argument of an outsider that a contract should be interpreted other than as agreed by the parties to it. The district court committed no reversible error of law or fact.

This reading of the specifications disposes, so far as now concerns us, of the contentions that Lukens' plate is defective and that the United States is being injured.

■ In regard to the antitrust aspect of this case, we fail to see how Lukens' actions definitionally constituted a tie-in. Lukens was not offering to sell steel plate only on the condition that the purchaser also make use of Lukens' testing facilities. In any event, the district court's finding as to the reason for the higher price for steel to be scanned is supported by the evidence and suggests that Lukens' pricing policies quoted to Electric Boat did not violate the antitrust laws.

In view of the small likelihood of success on the merits heretofore discussed, we need not reach the question of irreparability of harm *pendente lite*.

The district court's order denying the motion for a preliminary injunction will be affirmed.

2. Lukens challenged the standing of Penn Galvanizing in its answer to the complaint. We agree with the district court that it is not necessary to reach the question of standing because there is substantial doubt as to the prospects for the success of this claim on the merits.