**Eli RAITPORT**

v.

**NATIONAL BUREAU OF STANDARDS and the United States Government.**

**Civ. A. No. 73–2583.**

United States District Court,
E. D. Pennsylvania.

July 9, 1974.

Eli Raitport, pro se.

Paul E. Holl, Asst. U. S. Atty., Philadelphia, Pa., for defendant.

## OPINION

LUONGO, District Judge.

Since 1972, defendant National Bureau of Standards, an agency of the United States government and a subdivision of the Commerce Department, has been responsible for the operations of the Experimental Technological Incentive Program (ETIP). ETIP was established within the Bureau pursuant to the general authority of the National Bureau of Standards Act, 15 U.S.C.A. § 272,[1] to explore policies by which the federal government can stimulate technological innovation by private industry. To fulfill its mandate, ETIP invited the public to submit proposals and experiments relating to the program's objectives. Proposals found promising by ETIP were to be funded by the agency.

■■ Plaintiff Eli Raitport submitted to ETIP a proposal which was ultimately rejected. Raitport instituted this suit contending inter alia that the agency is not serving the purpose for which it was created and that his proposal was rejected, not on its merits, but because ETIP is acting to protect established companies from small innovative competitors. He seeks damages for lost profits and a decree enjoining ETIP from further spending of the funds allocated to it until it approves his proposal or one similar to it. This court has jurisdiction pursuant to 28 U.S.C. § 1331.[2]

1. 15 U.S.C. § 272 provides in pertinent part: "The Secretary of Commerce . . . is authorized to undertake the following functions:

\*     \*     \*     \*     \*

(f) Invention and development of devices to serve special needs of the Government."

2. Raitport's complaint cites the Administrative Procedure Act, 5 U.S.C. § 701 et seq.,

Presently before the court is Raitport's motion for preliminary injunction pending final hearing.

ETIP was set up in response to a perceived need, articulated in the President's State of the Union Message of 1972, to discover more "about the process of stimulating and applying research and development."[3] In the President's budgetary message for FY 1973, ETIP's goal was described as "initiating a series of experiments to find better ways to encourage private investment in R & D (research and development), including investment by small entrepreneurial R & D firms, which have made significant contributions to the generation and exploitation of innovative ideas . . . ."[4] In 1972 and 1973, ETIP issued a series of brochures and press releases describing its purposes and inviting the submission of projects conforming to the purpose of the program. These releases stated that ETIP would pursue its policy objectives by focusing on three areas: (1) Federal regulatory policy, (2) Federal procurement policy, and (3) assistance to inventors and small R & D firms.[5] There is nothing in ETIP's public releases which evidences a departure from the broad charge of the President's language and the Bureau of Standards enabling legislation. In a press release of May 16, 1973, for example, ETIP stated that its purpose in each of its project areas was to "obtain knowledge and experience concerning technological invention and innovation in the United States [and] determine cost effective actions government can take to increase the rate at which new technologies are introduced into the market place." (Exh. D–1A)

Raitport is a Pennsylvania resident. He is president of Scientronic Corp., a Pennsylvania corporation with its office in Philadelphia. He has a long-standing interest in reducing obstacles encountered by small entrepreneurs in the research and development area, particularly the obstacle posed by lack of access to capital. His concern dovetails with his professional interests. Either independently or through Scientronic, he has authored several papers designed to counsel small investors or entrepreneurs on pitfalls commonly encountered when investing or seeking capital. (Exh. D–1E) He also claims to have invented or designed plans to invent several devices, including an energy absorbing mechanism for cars, a heating and cooling system for small dwellings, and improved switches for sprinkler systems. For several years, Raitport had been writing to government officials making the case for a program generally like ETIP,

as a basis for federal jurisdiction. The Supreme Court has never explicitly held that the APA is jurisdictional although the Court has occasionally seemed to assume it. See, e. g., Rusk v. Cort, 369 U.S. 367, 371–372, 82 S.Ct. 787, 7 L.Ed.2d 809 (1962); Citizens Committee to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed. 2d 136 (1971). In light of the Supreme Court's inscrutability on the issue, I am constrained to follow the series of decisions by the Third Circuit Court of Appeals holding that the APA is not jurisdictional. Local 542, Internat'l Union of Operating Engineers v. NLRB, 328 F.2d 850 (3d Cir.), cert. denied, 379 U.S. 826, 85 S.Ct. 52, 13 L.Ed.2d 35 (1964); Zimmerman v. United States Gov't, 422 F.2d 326 (3d Cir.), cert. denied, 399 U.S. 911, 90 S.Ct. 2200, 26 L.Ed.2d 565 reh. denied, 400 U.S. 855, 91 S.Ct. 26, 27 L. Ed.2d 93 (1970); Getty Oil Co. v. Ruckelshaus, 467 F.2d 349 (3d Cir. 1972), cert. denied, 409 U.S. 1125, 93 S.Ct. 937, 35 L.Ed.2d 256 (1973). Nevertheless, jurisdiction lies in this court pursuant to 28 U.S.C. § 1331. The gist of this action is that a federal agency, created under the general authority of a federal statute, abused its power in rejecting Raitport's proposal for improper reasons. Consequently, it seems fair to say that Raitport's claim "arises under" federal law. The losses claimed are in excess of the $10,000 jurisdictional amount.

3. Weekly Compilation of Presidential Documents, Vol. 8 no. 4, pp. 66, 91.

4. Weekly Compilation of Presidential Documents, Vol. 8 no. 5, pp. 104, 115.

5. Subsequently, ETIP also focused its efforts on the area of Federal Small Business policy. (T 4, 11).

which would concern itself with the problems of small entrepreneurs involved in R & D.

In July 1972, shortly after the inception of ETIP, Raitport submitted a proposal to the agency in which he suggested that ETIP fund a United States Bank for National Economic Development to finance small entrepreneurs seeking to provide at lower cost products used in large volume in this country.[6] (Exh. D-1B) In Raitport's view, by fostering new competition in major established product areas, the Bank could contribute to a general reduction of prices, create new jobs and help products manufactured in the United States compete more effectively against foreign products. Quite obviously also, in his view, the aid to small entrepreneurs would directly spur research and development.

For more than a year following the July 1972 submission, Raitport and ETIP exchanged correspondence concerning the proposed bank, which Raitport renamed the United States Investment Banking Corporation (USIBC). The Bank, as it emerged in Raitport's view, would initially require $5,000,000 of ETIP's funds. Raitport's "group" would raise an additional $100,000,000 by selling shares of the Bank on the open market. The Bank would provide "start up" capital to those companies which proposed to manufacture low-cost substitutes for products having a broad and established demand in the United States. As an incentive to the public to invest in the Bank, ETIP would guarantee USIBC against net losses after consolidation of three years' operation. USIBC would hold at least 20% control of all companies to which it contributed money, and it could acquire more control either by negotiating with the management of the company or by tender offer. This equity interest, coupled with USIBC's regulatory power, would provide USIBC (and ultimately ETIP) with considerable control over the corporations to which money was given.

Although the basic concept of the Bank remained generally unchanged throughout, Raitport did amend his plan in one major respect during the course of correspondence. In its initial form, the Bank proposal included no role for him. However, the proposal later envisioned that he and a Board of Directors appointed by him would run the Bank's operations although appointment of the officers and directors would be subject to ETIP's approval. On June 5, 1973, Raitport notified ETIP that he had "finalized the selection of management team for United States Investment Banking Corporation (USIBC) in accordance with my proposal." (Exh. D-1 H, I, J)

ETIP's reaction to the proposal, expressed in a letter to Raitport dated August 25, 1972, was that it was "an intriguing concept . . . although [it might not] be possible to fit into ETIP format." (Exh. D-1F). Despite the prompt response, it is obvious from the record that ETIP was not yet geared up to seriously evaluate Raitport's proposal. For the first year of its existence, ETIP suffered the type of birth-pangs frequently experienced by fledgling government programs. As Richard T. Penn, ETIP's Deputy Director of Operations, testified "in 1972 ETIP was not in the position to accept or reject any proposals. It did not have an approved operational statement under which to operate, and it had no funds." (T 28). Although the President had requested 14.4 million dollars for ETIP in his budget for FY 1973, the program was not final-

---

6. Along with the Bank proposal, Raitport also submitted to ETIP plans for his various inventions. ETIP immediately refused to consider the merits of these engineering devices, on the ground that they did not fall within the agency's purview. The agency encouraged Raitport to submit these devices to other government agencies including the National Science Foundation and the Environmental Protection Agency. Raitport does not challenge ETIP's conclusions with respect to his engineering inventions, and only the Bank proposal is at issue in this action.

ly funded until May 6, 1973, when the Office of Management and Budget (OMB) allocated 7 million dollars to it.[7] Because of this fiscal uncertainty and the fact that ETIP had not yet fully defined its objectives, (T 55), no proposals were approved during FY 1973. (T 8).

Nevertheless, after the program's funding was set, ETIP began exploring Raitport's proposal in detail, requesting clarification about the envisioned operation of the Bank. In a letter dated July 6, 1973, for example, ETIP wrote:

" . . . those suggestions that are offered for our consideration must contain more detail than you have offered on pages nine and ten of your June 4, 1973, letter. Specifically, we need to know (a) how many firms have products otherwise unable to enter the market place for lack of seed capital, but willing to except (sic) the terms you propose? (b) what method have you used, or will you propose to use in selecting borrowers? and (c) what record of performance do the selected officers of the proposed investment firms have, to illustrate their expertise and success in this rather specialized form of finance?[8]

ETIP also expressed extreme concern about the $5,000,000 price tag ("the amount of money suggested is much too large") and the proposed ten year funding period and asked if a scaled-down version would be possible. (Exh. D–1M).

Raitport responded to the specific questions raised by ETIP with sweeping generalizations and optimistic assertions. For instance, he expressed the view that "literally hundreds of firms . . . and every sincere firm" would want capital from the Bank despite the conditions which presumably would limit their freedom of management. The qualifications of the Bank's proposed management team included "many years of devotion to that program by each member; . . . a good understanding of the subjected (sic) problem and ability to devise a solution; . . . extensive knowledge of the components market . . . and the materials and manufacturing process, . . . thorough knowledge of corporate finance . . . ." Although Raitport conceded that the Bank could be funded with less than $5,000,000, he suggested strongly that the Bank would not be very successful if funded with less than that amount. In Raitport's view, the Bank "deserved 70% of the money allocated by ETIP, even more, because only a program like USIBC will justify existence of ETIP in all areas of endeavor." (Exh. D–1R)

On August 1, 1973, ETIP informed Raitport that his bank proposal could not be funded in its present form. The reasons stated for the rejection were cost and the proposal's lack of specificity. (Exh. D–1S) (T 77–78). In a letter to Senator Hugh Scott, whose office, at Raitport's request, had inquired about ETIP's reaction to the bank proposal, ETIP also stated that Raitport's proposal furnished no opportunity "to perform experiments in policy areas prescribed by ETIP's approved program plan." (Exh. D–1P) (T 73).

Raitport contends that ETIP is operating unlawfully, in defiance of its mandate. He argues that rather than pro-

---

7. Of the 7 million dollars eventually allocated by OMB for FY 1973, ETIP spent only $850,000, approximately $750,000 for staff costs and the remainder for preliminary analysis and for design of specific experiments with the General Services Administration. For FY 1974, ETIP's allocation was again 7 million dollars. (T 8).

8. This last question is somewhat ambiguous; it is difficult to ascertain whether ETIP was interested in knowing the qualifications of Raitport's proposed bank directors or the qualifications of officers of the firms to which the bank would give money. Raitport evidently assumed it was the former, but Penn's testimony reveals that ETIP was not interested in the background of the bank's proposed directors until it obtained more information on which to evaluate the proposal. (T 15).

moting innovation, ETIP is actually engaged in protecting established, stand-pat companies by refusing to aid small innovative competitors which are potentially more efficient, and he contends that his bank plan was rejected solely because it would tend to produce more vigorous competition. In Raitport's view, ETIP's creation has actually heightened the obstacles for small entrepreneurs. He also argues that private sources of capital, operating in the belief that the federal government was prepared to subsidize small firms engaged in R & D, have discontinued loans to firms in these areas of endeavor.

The threshold question posed by this case is whether the court has any power to review ETIP's rejection of Raitport's proposal. The Administrative Procedure Act, 5 U.S.C. § 701 et seq., provides that decisions by each authority of the government of the United States, which would include ETIP and the Bureau of Standards, are subject to judicial review except where there is a statutory prohibition on review or where agency action is "committed to agency discretion by law."

In this case, there is certainly no statutory provision which can be read to restrict access to judicial review, but the question of whether the action here is committed to "agency discretion by law" is somewhat more complex. While "this is a very narrow exception" to the presumption of reviewability, "it is applicable in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971); cf. National Helium Corp. v. Morton, 326 F.Supp. 151 (D.Kansas 1971). The reviewing function is necessarily premised on the court's having a standard against which to evaluate agency action. A sweeping unstructured grant of administrative authority could support the inference that the legislature wanted no judicial interference with administrative decision-making. Here, however, Congress has

not legislated at all with respect to ETIP. In the absence of any legislative enactment, the agency action cannot have been "committed to agency discretion by law," and therefore, judicial review should not be foreclosed.

It could be argued, of course, that Congress evinced its intent to insulate agencies such as ETIP from judicial review when it granted the Secretary of Commerce power to create such agencies within the Bureau of Standards, but it strikes me as unwise to foreclose review of ETIP's decisions on the strength of general language of an enabling statute adopted 22 years before ETIP's creation. The repeated statements by the Supreme Court that judicial review is the rule and non-reviewability the exception are not whimsical. See, e. g., Abbott Laboratories v. Gardner, 387 U.S. 136, 140, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) and the cases cited therein. They flow inexorably from the "cardinal principle" that "when interests affected are of sufficient magnitude any initial exercise of power should be subject to check by an independent authority." Davis, Administrative Law Treatise, § 28.16 [3]. Many lower courts, animated by the fear that unchecked power will be abused, have refused to bar access to judicial review in cases where strong arguments could be made that Congress intended to commit the decision to agency discretion by law. See, e. g., Kendler v. Wirtz, 388 F.2d 381 (3d Cir. 1968); Littell v. Morton, 445 F.2d 1207 (4th Cir. 1971); Reece v. United States, 455 F.2d 240 (9th Cir. 1972). Only "a narrow band of matters" remains in which "the inappropriateness or even mischief involved in appraising a claim of error or of abuse of discretion . . . leads to the conclusion there has been withdrawn from the judicial ambit any consideration of . . . the official action." Curran v. Laird, 136 U.S.App.D.C. 280, 420 F.2d 122, 131 (1969).

Although I conclude that judicial review is not foreclosed in this case, it serves only a limited function. It is axiomatic that the court will not substitute

its judgment for the agency's. This is particularly true in a case such as this where the agency's determination ostensibly rests "on complex and subtle evaluations of the technical merit of plaintiff's project and the professional competence of the plaintiff himself." Kletschka v. Driver, 411 F.2d 436, 443 (2d Cir. 1966). Assessing proposed experiments on their technical merits to decide how well they would further the goal of spurring technological innovation requires an expertise far different from that possessed by courts. On the other hand, plaintiff here has alleged that ETIP acted fraudulently in rejecting his proposal because the agency was motivated by a desire to shield existing companies from competition. He also contends that the agency has departed from its mandate. Assessing the soundness of these allegations is peculiarly a judicial function. An accommodation between the administrative and judicial functions is provided by the APA, 5 U.S.C. § 706(2)(A), which requires the court to "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." In short, ETIP's decision will be set aside only "if it [was] made without a rational explanation, inexplicably departed from established policies . . . or . . . [was based] on other 'considerations that Congress could not have intended to make relevant.'" Wong Wing Hang v. Immigration and Naturalization Service, 360 F.2d 715, 719 (2d Cir. 1966).

Accepting the premise that the court has the power to review, but limiting it as noted above, Raitport's motion for a preliminary injunction can be disposed of rapidly. As the Court of Appeals for the Third Circuit stated in Penn Galvanizing Co. v. Lukens Steel Co., 468 F.2d 1021, 1023 (3d Cir. 1972):

"The criteria for obtaining a preliminary injunction and the standard of review of the trial court's decision are well settled. A party seeking a preliminary injunction must demonstrate, inter alia, a reasonable probability of eventual success on the merits and irreparable injury *pendente lite*."

Raitport has produced no evidence whatsoever to support his claim that ETIP abused its discretion. The extensive correspondence between Raitport and ETIP is laced with inquiries by ETIP about the specifics of the proposal. ETIP's concern about the cost of the proposal, the requested long-term funding, the number of potential applicants for funds and the method of choosing between them all pertained directly to the viability of the proposal. The testimony of Penn, ETIP's Deputy Director of Operations, confirms the impression that Raitport's bank proposal received full and adequate consideration on the merits and that it was rejected (in the form in which it was presented) on the merits. (T19–23)

Contrary to Raitport's allegation, there is no evidence that his proposal was rejected because ETIP wanted to safeguard established companies from competition. Rather, testimony adduced at hearing suggests that Raitport has misconstrued ETIP's objectives. The record makes it unmistakably clear that Raitport believes that ETIP was created for the purpose of placing capital in the hands of small entrepreneurs in R & D. Penn testified that it was not the general policy of ETIP to enhance competition by funding the individual projects of small companies.[9] (T 18, 62). Instead, ETIP sought, through its experiments ways to facilitate the entry of many small firms into the market and in this way to indirectly promote competition. (T 57). The fact that ETIP does not conform to Raitport's expectations does not mean that the agency is not performing lawfully according to its mandate.

9. A certain portion of ETIP's funds, however, must be given to small businesses as defined by the Small Business Administration.

Raitport has also claimed that ETIP's existence tended to "dry up" alternative sources of capital previously available to small firms. In effect, Raitport asserts that banks and other lending institutions shared his view that ETIP's creation signalled a commitment by the government to provide venture capital to small businesses. Penn did testify "that a number of people perceived (sic) the President's message that the government was going to fund a large number of small technological developments." (T 62). However, Raitport produced no evidence that any lending institutions had altered their loan policies as a result of ETIP's creation. He offered no examples of entrepreneurs who were refused financial help because of ETIP's existence. Moreover, even if such evidence were adduced, a serious question remains whether judicial relief would be appropriate. ETIP has not intended "to create the impression generally among the small business community in this country that they could look to the federal government for support for their individual activities." (T 68) (testimony of Penn). A mistaken impression, created inadvertently, would neither constitute nor connote unlawful agency conduct which could be remedied by judicial relief. It could be advisable for ETIP to clarify its objectives in subsequent public releases, but an injunction enjoining the agency from operating would be unjustifiable.

The record suggests that Raitport and ETIP were operating on slightly different wavelengths throughout. While a bank such as Raitport proposed could have been funded by ETIP without doing violence to the broad objectives of the program, ETIP was certainly not created for the purpose of funding a bank. It is probably fair to say that the experiments ETIP sought to fund were one step removed from Raitport's bank proposal. ETIP might have decided to invest a part of its funding to a *study to determine whether such a bank was advisable*, rather than investing a substantial portion of the funds in the bank itself.

There is no denying Raitport's sincerity in this matter. In large part, however, the depth of his feeling can be traced to his belief that he was personally responsible for ETIP's creation and was therefore entitled to some share of ETIP's funds. For example, in one of his letters, Raitport wrote that

> "It is our understanding that the President's message responsible for the creation of ETIP, was prompted by our endeavor to convince government to establish a source of capital for development of technology for the purpose outlined in our proposals. Our proposals, in various forms, have preceeded ETIP by many years, and we are convinced that the President's message and the understanding by the Congress were very much in line with our proposals." (Exh. D–1T)

Similarly, in a letter which went to several Senators, Raitport wrote:

> "For several years I and my associates have endeavored to influence the government to adopt a plan which is the only logical way to cure inflation . . . until the last year we were completely ignored. *Last year President Nixon did introduce to Congress a plan—[ETIP] . . . which could be interpreted as a test of our plan . . . . We submitted a modified proposal to the ETIP tailored to the limited funds.*" (Emphasis added) (Exh. D–1M)

There is no evidence to confirm that Raitport was instrumental in ETIP's founding. Moreover, even if it could be demonstrated that he was directly responsible for ETIP's creation, that fact would not entitle him to a share of ETIP's funds for any proposal he might choose to submit.

In sum, Raitport has produced no evidence to support his claim that, in rejecting his proposal, ETIP conspired with established oligopolies to restrain trade or that it was motivated by a de-

sire to limit competition. There is no evidence to support any allegation of fraud, conspiracy or embezzlement. Raitport has also failed to make any showing that ETIP's existence tended to "dry up" alternative sources of capital previously available to small firms. The evidence does support the conclusion that ETIP gave Raitport's proposal serious consideration before rejecting it. It appears unlikely in the extreme that Raitport will be able to prevail on the merits. His motion for a preliminary injunction will be denied.

The foregoing shall constitute Findings of Fact and Conclusions of Law required by F.R.C.P. 52(a).