**DANARA INTERNATIONAL, LTD., Plaintiff,**

v.

**UNITED STATES CONSUMER PRODUCT SAFETY COMMISSION, Defendant.**

No. 82–2844.

United States District Court,
D. New Jersey.

Oct. 19, 1982.

**368**

Locker, Greenberg & Brainin by Christopher J. Corbett, and Aaron Locker, New York City, for plaintiff.

W. Hunt Dumont, U.S. Atty. by Anne C. Singer, Asst. U.S. Atty., and Mana L. Jennings, Assoc. Gen. Counsel, Washington, D.C., for defendant.

LACEY, District Judge.

This is an application for a temporary restraining order by the plaintiff to restrain the defendant from publishing a certain press release. Because of the emergent nature of the matter, I am placing this opinion in the record.

Defendant, Consumer Product Safety Commission ("CPSC"), intends to distribute immediately a press release, the text of which is as follows:

"FOUR DANARA SQUEEZE TOYS MAY PRESENT CHOKING HAZARD TO INFANTS AND SMALL CHILDREN. WASHINGTON, D.C.—The Consumer Product Safety Commission today announced that its staff has made a preliminary determination that four squeeze toys distributed by Danara International, Ltd., of South Hackensack, New Jersey, may cause choking and/or suffocation because the handles are small enough to lodge in the throat and obstruct the airway. Although these particular squeeze toys have not been involved in any choking incidents known to CPSC, similar shaped squeeze toys have been involved in choking deaths.

"All four squeeze toys have bulbous shaped ends measuring ¾ " to 1½ " in diameter. These toys are described as follows:

"Mickey Mouse head on a yellow handle, 5½ " long.

"Mickey Mouse head on a yellow handle, 7 " long.

"Donald Duck head on a blue handle, 6½ " long.

"Yellow mallet with Mickey Mouse face and 'MICKEY' embossed on handle, 7¼ " long with bulbous end.

"These toys are made of soft, easily compressed plastic material and are packaged and sold under the brand name 'SAFE–GUARD' and labeled 'WALT DISNEY CHARACTER Squeek-A-Toy.' The Mickey Mouse and Donald Duck toys are labeled 'No. 5523.' The mallet is labeled 'No. 5503.' Stamped below the back of the neck of the Mickey Mouse and Donald Duck toys is 'WALT DISNEY PRODUCTIONS DANARA INTERNATIONAL LTD MADE IN TAIWAN.' Stamped around the squeaker of the mallet is 'WALT DISNEY PROD MADE IN TAIWAN DANARA INTERNATIONAL.' "

[Photographs of products then follow.].

"It is recommended that consumers should remove these toys from use immediately and discard them. Anyone wishing additional information may contact CPSC's toll free hotline at the following numbers: 800–638–8326. . . ."

The CPSC purports to be acting pursuant to the authority granted it by Sections 6(b)(1) and 6(b)(2) of the Consumer Product Safety Act, 15 U.S.C. Sections 2055(b)(1), 2055(b)(2), which provide:

"(b)(1) Except as provided by paragraph (2) of this subsection, not less than 30 days prior to its public disclosure of any information obtained under this chapter, or to be disclosed to the public in connection therewith (unless the Commission finds that the public health and safety requires a lesser period of notice and publishes such a finding in the Federal Register), the Commission shall, to the extent practicable, notify and provide a summary of the information to, each manufacturer or private labeler of any consumer product to which such information pertains, if the manner in which such consumer product is to be designated or described in such information will permit the public to ascertain readily the identity of such manufacturer or private labeler, and shall provide such manufacturer or private labeler with a reasonabl opportunity to submit comments to the Commission in regard to such information. The Commission shall take reasonable steps to assure, prior to its public disclosure thereof, that information from which the identity of such manufacturer or private labeler may be readily ascertained is accurate, and that such disclosure is fair in the circumstances and reasonably related to effectuating the purpose of this chapter. In disclosing any information under this subsection, the Commission may, and upon the request of the manufacturer or private labeler shall, include with the disclosure any comments or other information or summary thereof submitted by such manufacturer or private labeler to the extent permitted by and subject to the requirements of this section.

"(2) If the Commission determines that a document claimed to be inaccurate by a manufacturer or private labeler under paragraph (1) should be disclosed because the Commission believes it has complied with paragraph (1), the Commission shall notify the manufacturer or private labeler that the Commission intends to disclose such document at a date not less that 10 days after the date of the receipt of the notification. The Commission may provide a lesser period of notice to disclose if the Commission finds that the public health and safety requires a lesser period of notice and publishes such finding in the Federal Register."

By letter of May 25, 1982, the Commission informed Plaintiff Danara International, Ltd., ("Danara"), that the Commission had received reports that squeeze toys had been involved in recent choking deaths. The squeeze toys, according to the Commission's letter, were shaped similarly to rattles which were removed from the market upon the issuance of CPSC's Requirements for Rattles, 16 CFR 1510. The letter continued:

"Although squeeze toys are not subject to 16 CFR 1510, we are concerned that some squeeze toys may present the same type of choking and suffocation hazard as those pre-standard rattles. During a recent inspection of a retailer, we collected Squeek-A-Toy No. 5523 (A Mickey Mouse head on a handle in two sizes—5½ ″ and 7 ″ long). Also collected at a different location were two Squeek-A-Toys No. 5503. (a wrench with a Donald Duck picture on it and a mallet with a Mickey Mouse picture on it) and Safe-Guard Squeeze Toy No. 611 (Giraffe).

"The handles on both sizes of Squeek-A-Toy No. 5523 are similar in size and shape to two other squeeze toys which were involved in the deaths of two infants. This similarity is such that in our opinion it poses the same potential for choking. We have, therefore, made a preliminary determination that both sizes of Squeek-A-Toy No. 5523 present a substantial product hazard as defined by Sec-

tion 15 of the Consumer Product Safety Act (CPSA).... At this time we ask that you supply the information requested in 16 CFR 1115.13(d)...."

The letter sought the cooperation of Danara in formulating corrective action and assured Danara that, pursuant to the Commission's own statutory scheme, confidential information provided to the Commission pursuant to the requested disclosure would be protected from public dissemination. To obtain the protection from disclosure, however, Danara was instructed to stamp the information "Confidential."

Danara responded through counsel to the letter of the Commission, purportedly in compliance with the request for submission of 16 CFR 1115.13(d) information. The letter (not marked "Confidential") objected to the application of the "Rattle" guidelines to Danara's products without the benefit of a prior hearing and industry-wide regulation on this point. No suggested corrective action was offered by Danara.

Moreover, plaintiff did not ask to review the data and other "similar" products referred to by the CPSC letter of May 26, 1982.

On June 10, 1982, a meeting was held between Danara and a Compliance Officer of the Commission. The Compliance Officer described the chronology of the case and indicated those Danara squeeze toys which the Commission felt were hazardous and should be removed from the market. This meeting was followed by a letter from the Commission to Danara, which stated that "The Commission may issue a press release containing some of the information set forth above [that Danara's squeeze toys presented a choking and/or suffocation hazard] and drawings of the squeeze toys.... The Commission may also disseminate this information to appropriate consumer groups and to publishers of baby product-oriented publications." The letter also invited comments from Danara to be included in the press release if Danara felt that the statements in the release were inaccurate. The Commission stated that the solicitation of Danara's comments was a "reasonable

step" taken by the Commission to assure the accuracy of the press release.

Danara responded to this letter with a letter of August 5, 1982, from counsel, in which Danara argues that the information in the press release could not be disclosed because it had been provided pursuant to Section 15(b) of the Consumer Product Safety Act. The letter reiterated Danara's position that the squeeze toys be subjected to an adjudicative hearing, at which Danara could challenge the Commission's findings that the squeeze toys were similar to the rattles which had been subjected to prior Commission proceedings and banned. The letter raised other legal arguments in opposition to the Commission's desire to publish the press release. Again, no request was made to view the CPSC's underlying data or the "similar" squeeze toys involved in the reported fatalities.

On Friday, August 29, 1982, Danara's counsel learned that the Commission intended to publish the press release on August 31, 1982. This application for a temporary restraining order prohibiting the Commission from distributing the press release and for preliminary and permanent injunctive relief enjoining distribution of the press release followed on August 30, 1982. A telephone conference call was held between the court, Danara's counsel and a staff attorney for the Commission, as a result of which the Commission agreed to withhold distribution of the press release pending a hearing on the application for a temporary restraining order in open court on August 31, 1982.

Thereafter, the Commission asked for and received a further postponement until September 2, 1982, so that it might adequately brief the matter; and argument was heard on September 2.

Plaintiff argues that Section 6(b)(5) of the CPSA prohibits the release of the information contained in the press release, in that the information was obtained pursuant to a Section 15 Report made to the Commission. Plaintiff also argues that Section 6(b)(6) of the CPSA and the general overall intent of Section 6 of the Act prohibit the

release of the information contained in the press release since the Commission has not promulgated any regulations governing the release of the information.

Additionally, the plaintiff argues that the Commission has not satisfied the requirements of Section 6(b)(1) of the Act because it has not taken "reasonable steps" to assure that the information in the press release is accurate, and that the disclosure is "fair in the circumstances and reasonable related to effectuating the purposes of this chapter." Plaintiff charges that the contemplated release is neither "fair" nor "accurate."

Section 6(b)(5) of the CPSA (15 U.S.C. 2055(b)(5)) provides:

"In addition to the requirements of Paragraph (1), the Commission shall not disclose to the public information submitted pursuant to Section 15(b) of this title respecting a consumer product unless—

(a) the Commission has issued a complaint under Section 15(c) or (d) of this title alleging such a product presents a substantial product hazard;

(b) in lieu of proceeding against such product under Section 15(c) or (d) of this Title, the Commission has accepted in writing a remedial settlement agreement dealing with such products; or

(c) the person who submitted the information under Section 15(b) of this title agrees to its public disclosure.

"The provisions of this paragraph shall not apply to the public disclosure of information with respect to a consumer product which has been the subject of an action brought under Section 12, or which the Commission has reasonable cause to believe is in violation of 19(a), or information in the course or concerning a judicial proceeding."

Section 6(b)(6) of the CPSA provides:

"Where the Commission initiates the public disclosure of information that reflects on the safety of a consumer product or class of consumer products, whether or not such information would enable the public to ascertain readily the identi-

ty of the manufacturer or private label, the Commission shall establish procedures designed to ensure that such information is accurate and not misleading."

Sections 6(b)(1) and 6(b)(2) are set forth supra.

Given the submissions and argument, the plaintiff's application to enjoin the issuance of the press release is denied. Apposite are cases relating the law of this circuit on preliminary injunctions.

In *Kershner v. Mazurkiewicz,* 670 F.2d 440, (3d Cir.1982), the court wrote:

"A preliminary injunction is not granted as a matter of right. *Eli Lilly & Co. v. Premo Pharmaceutical Laboratories, Inc.,* 630 F.2d 120, 136 (3d Cir.), cert. denied, 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980). It may be granted, however, if the moving party demonstrates both a reasonable probability of eventual success in the litigation and that the party 'will be irreparably injured pendente lite if relief is not granted.' Id. at 136; *Kennecott Corp. v. Smith,* 637 F.2d 181, 187 (3d Cir.1980). The trial court may also consider the possibility of harm to other interested persons from the grant or denial of the injunction, as well as harm to the public interest. *Eli Lilly & Co.,* 630 F.2d at 136. The grant or denial of a preliminary injunction is committed to the sound discretion of the district judge, who must balance all of these factors in making a decision. *Penn Galvanizing Co., v. Lukens Steel Co.,* 468 F.2d 1021, 1023 (3d Cir.1972).... Unless the trial court abused its discretion, or committed an error in applying the law, we must take the judgment of the trial court as presumptively correct. *Continental Group, Inc. v. Amoco Chemicals Corp.,* 614 F.2d 351, 357 (3d Cir.1980)."

The Third Circuit has also stated that the moving party:

" ' "must demonstrate that irreparable injury will occur if relief is not granted to maintain the status quo until a final adjudication on the merits can be made and that there is a reasonable probability of

eventual success on the merits. In addition, the court must weigh the possibility of harm to the nonmoving party as well as any other interested person and, when relevant, harm to the public.' "

*Rennie v. Klein,* 653 F.2d 836, (3d Cir.1981) (en banc), citing, *The Continental Group, Inc., v. Amoco Chemicals Corp.,* 614 F.2d 351, 356–57 (3d Cir.1980).

■ Thus, the court must balance four factors in considering whether to exercise its discretionary powers and grant injunctive relief: irreparable harm; success on the merits; the balance of equities between the moving and nonmoving parties, and between the moving party and other interested parties; and the public interest.

As to irreparable harm, plaintiff avers, by way of the verified complaint, that release of the press release would irreparably injure its goodwill and reputation. Danara contends that its competitive position would be adversely affected by public disclosure that these products posed a substantial "choking and/or suffocation hazard," both as to the product in question and as to the other products it manufactures.

It appears that the press release deals with four products of the twenty-one marketed by plaintiff which the CPSC inspected. It is not established what percentage of overall sales these four products represent. It is also noted that unlike certain other manufacturers of squeeze toys, the plaintiff here flatly refused to consider modifying its products. Moreover, it is not clear what effect a press release like that contemplated will have on sales, particularly given the statement that no accidents are known to have occurred with the Danara product. Finally, it is to be anticipated that any other like products will also be the target of CPSC proceedings, thus mitigating the impact of the instant press release upon Danara.

In view of the overall uncertainties, I shall not at this time deal with the matter of irreparable injury.

Turning now to the likelihood of success, I want to deal briefly with the submissions that were given to the court by the Commission. This court has carefully considered the affidavits and exhibits submitted by the Commission and as well by the plaintiff. Turning to the declaration of Richard Early made in this proceeding, it is indicated that the Division of Regulatory Management of the CPSC became aware of four infant deaths by suffocation associated with squeeze toys. Each death involved a situation where squeeze toys with a baseball bat shape became lodged in the infant's throat, blocked the airway, and caused death by suffocation. See Coroners' Reports attached as Attachment A to Early declaration.

In February 1982, Mr. Early issued an assignment to Regional Offices requesting inspections and retail surveillance to screen squeeze toys for those which were similar to, in terms of size and shape, the squeeze toys involved in the infant deaths. One hundred and thirty toys were collected by the Regional Staff and sent to Bethesda, Maryland for evaluation.

Attachment J to Commission Exhibit 3 describes the method of evaluation employed by the Commission to determine whether the squeeze toys collected by the Regional Offices were similar to the squeeze toys involved in the infant deaths. Attachment J described the reflexes exhibited by children in the four to nine month age category which can make certain objects hazardous in the sense that they might be placed in an infant's mouth and block the air passageway. The memo described the sizes of the toys associated with choking incidents as ranging from "about 1 to 1¼ inches in diameter at the end, and about 3 to 5 inches in potential penetration depth." The memo notes that research done in connection with the Federal Hazardous Substance Act Regulation on Baby Rattles confirmed that certain sized items present a danger in terms of infant suffocation. Concerning this prior research, the memo notes, "As far as we know, this is still the best data that exists to date."

The memo indicates that the compressibility of squeeze toys was calculated when

making the comparison of the collected items and the toys involved in the infant death. Cylindrical shaped objects, with a flared end, were indicated to have a greater potential for insertion and airway blockage because of their smooth surfaces. Finally, the flexibility of a squeeze toy was considered. More flexible toys were considered more dangerous because the toy could bend with the child's mouth and block the air passage more easily.

Using these considerations as criteria, including the tests developed previously for use on baby rattles, the Commission staff, of which Mr. Early was one, determined that 19 products of 6 manufacturers presented substantial product hazards. Manufacturers, including Danara, were contacted concerning the possibility of corrective measures. Others have cooperated, but Danara has refused to cooperate.

In June 1982, personnel from the Northeastern Regional Office met with the vice president of Danara and reviewed the staff's determination that the four squeeze toys involved in the present application presented substantial product hazards and should be recalled. In response to this meeting, Danara's counsel asserted that Danara did not intend to recall items. According to Mr. Early, it was through investigation that the information contained in the press release was obtained.

Christine Nelson, compliance officer with the CPSC, prepared the press release at issue here. Exhibit 4 to Defendant's Memo. Prior to June 17, 1982, Nelson avers, she was aware that Danara products had been ranked as choking hazards by the Commission staff. See Nelson affidavit at para. 19. I note that June 17, 1982 is the date of the supposed 15(b) letter from Danara to the Commission.

Procedures governing the issuance of press releases are set out by the Chairman of the Commission. See Attachment A to Nelson declaration at 18. In accordance with these procedures, the press release was reviewed by the Staff of the Division of Human Factors, by the Office of Program Management, by the Office of the Executive Director, and by the Office of General Counsel. Finally, the proposed press release was reviewed by the entire Commission during a closed meeting held on August 25, 1982.

In contrast to the affidavits detailing the steps taken by the Commission in arriving at its decision to release the press release, the plaintiff has presented no affidavits from medical personnel or other appropriate experts which would indicate that studies have been conducted since notice first came to Danara of the Commission's position. Plaintiff has known of this position since May, and yet plaintiff and its counsel are now in court with nothing that disputes the Commission's factual assertions regarding the dangers posed by squeeze toys in general or Danara's products in particular. Instead the challenge is issued to the procedures used rather than the underlying merits.

■ Against this background plaintiff has failed to demonstrate success at final hearing. Its argument based on Section 6(b)(5) is unconvincing. Applying the section in the manner proposed by plaintiff here would not be consonant with the other provisions of the Act. The material in the proposed press release is available to any purchaser of the plaintiff's squeeze toy. The release merely includes a description of the products of plaintiff and various identifying marks. It is not this to which plaintiff objects, actually, but to the designation of these products as "choking and/or suffocation" hazards. These latter characterizations certainly were not submitted by plaintiff pursuant to the Section 15(b) report, or as part of any other voluntary disclosure to the Commission. Plaintiff, in fact, has from the outset disputed the characterization of the products as hazardous. How then can it be said that Section 6(b)(5) bars the dissemination of such information?

Furthermore, to give the section the construction urged by plaintiff would be to totally eviscerate the power of the Commission under Sections 6(b)(1) and 6(b)(2). A manufacturer or private labeler could effectively preclude the Commission from taking

any action under these sections by voluntarily providing undisputed information that the product is hazardous. It is my belief that this section addresses itself to trade secrets or other confidential or trade information which a manufacturer may provide the Commission in a 15(b) report or otherwise; and would be applicable to protect such information as, for example, that plaintiff had received reports of injury to consumers.

■ Turning to plaintiff's argument based on Section 6(b)(6), this section specifically addresses the situation at issue here, where the Commission has initiated "the public disclosure of information that reflects on the safety of a consumer product or class of products." It mandates that the Commission "shall establish procedures designed to ensure that such information is accurate and not misleading."

In *The Fountainhead Group, Inc. v. Consumer Product Safety Commission, et al.,* 527 F.Supp. 294 (N.D.N.Y.1981), upon which plaintiff relies, the United States District Court for the Northern District of New York enjoined the Commission from releasing certain information which had been the subject of a Freedom of Information Act request and a notification sent to the plaintiffs pursuant to Section 6(b). In issuing the preliminary injunction, the Court found that the provisions of the CPSA dealing with the release of information and of the Administrative Procedure Act generally, required that the Commission issue regulations setting standards and procedures to be followed before releasing information pursuant to Section 6 of the CPSA. Because the Commission had not yet promulgated such procedures and standards, the Court found that it could not release the information identifying the plaintiffs.

To date, the Commission has not yet promulgated the final regulations governing the release of information by the Commission. In disputing the information contained in the press release, plaintiff argues that this information cannot be disseminated until such time as the Commission promulgates regulations governing such release.

*Fountainhead* is distinguishable. The information at issue there could be more fairly characterized as confidential or trade secret material of the type described above. The plaintiff in Fountainhead had cooperated with the Commission in designing corrective measures, which included a joint press release and a recall action. Nevertheless, the Commission sought to disclose information which the plaintiff considered confidential. Here, it is precisely because Danara has not cooperated in designing corrective measures that the Commission seeks to release the information. Thus, I perceive a completely different balance of equities between the situation in Fountainhead and the situation here.

Finally, as to the law upon which the Fountainhead court relied, the court overlooked the admonition that the interpretation given a statue by an agency charged with its administration should be given deference. *Udall v. Tallman,* 380 U.S. 1, 16–18, 85 S.Ct. 792, 801–2, 13 L.Ed.2d 616 (1965). As for the case of *Dow Chemical v. Consumer Product Safety Commission,* 459 F.Supp. 378 (W.D.Ca.1978), also cited by plaintiff, I believe that the determination made by the Commission here as to four specific toys cannot be compared to the industry-wide determination invalidated in Dow. Therefore, I find Dow to be inapposite.

■ Plaintiff also argues that because the Commission has not acted under rule-making or adjudication to assure that the press release is accurate, it has therefore violated Section 6(b)(1) of the Consumer Product Safety Act. The short answer to this argument is that Section 6(b)(1) contains no requirement that the Commission proceed pursuant to rulemaking or adjudication; the Commission need only take "reasonable steps" to assure accuracy.

The Commission's submissions reflect that while it has not promulgated regulations on the matter, it did "establish procedures designed to ensure that ... [the] information [in the release] is accurate and

not misleading." It has also met the prescription of Section 6(b)(1) by taking "reasonable steps" to assure that the disclosure is "fair in the circumstances and reasonably related to effectuating the purposes" of the statute.

Thus, it learned of four infant deaths resulting from squeeze toys and then undertook the comprehensive study that I have earlier described to determine that these toys with bulbous shaped ends and narrow handles were the cause of the infant choking deaths. The submissions support the claim that the staff people doing the investigation were acting conscientiously and in good faith; and there is not a suggestion that Danara was somehow singled out for prosecution or for proceeding against; indeed, several manufacturers of squeeze toys were covered.

Thereafter, Danara was first notified of the problem over three months ago, and it has had ample time to contest on the merits the notion that its toys were hazardous. As I have already noted, to this day it has submitted nothing from any expert source, for example, a pediatrician, that its toys are not hazardous.

Danara was thereafter informed that if it disputed the accuracy of the press release a comment from Danara would be included in any press release issued by the Commission. Danara chose not to include such a statement in its response to the Commission.

Based upon the other information that has been conveyed to me and to which I have referred earlier, it is clear that the procedures that were set forth to assure the accuracy of the information and to ensure that the entire proceedings were accomplished fairly meet the requirements of the statute.

■ To repeat to a degree, although Section 6(b)(6) requires the Commission to establish procedures to assure the accuracy of the information it releases, Danara has cited to no authority for its assertion that this requires the Commission to afford a full adversary proceeding prior to publishing a press release pursuant to Section 6(b)(1) or 6(b)(2). In fact, the legislative history of Section 6(b)(6) is explicit, that the "requirement is solely a direction to the Commission to establish internal clearance procedures." H.R. REP. NO. 208, 97th Cong., 1st Sess. 1,880, reprinted in [1981] U.S.Code Cong. & Ad.News 396, 1242. In this case the recommendation of the Commission staff was presented to the Commission for approval, along with all of the studies undertaken concerning the choking dangers of Danara's squeeze toys. This satisfies the statutory requirement of Section 6(b)(6).

Thus, despite the holding of the Fountainhead court, which holding I note is presently on appeal to the Second Circuit, I find that the plaintiff has not shown a likelihood of success on the merits.

Turning to the matter of public interest, here it merges with the balancing factor, and as merged these factors militate strongly against the application. The Commission is aware of and has provided documentation to this court concerning infant deaths resulting from infants having placed these bulbous ended narrow handled squeeze toys in their mouths, blocking the passageway and causing suffocation; and has concluded that Danara is the manufacturer of bulbous ended, narrow handled squeeze toys, similar to those causing deaths.

Plaintiff has made no showing that the public interest has been violated by Commission action. Danara's position apparently is that absent a full scale adversary hearing, nothing short of an infant injury or death from choking on one of its products should require it to undertake the corrective action suggested by the Commission. Dealing as we are with dissemination of information which may preserve an infant's life, and particularly in light of the fact that Section 6(b)(1) and 6(b)(2) provide the Commission with the authority to act as it did and intends to do here, I find that the public interest would not be served by the grant of a temporary restraining order.

■ In so finding, and dealing with the other factor which I said emerged with the public interest factor, namely, the balancing

of interest, it is clear to me that the Commission here serving the public interest that I have just defined, has by far the better of it in the matter of balancing.

The application for the temporary restraining order is denied for the reasons that I have set forth.